Argued October 31, 1960, reversed and remanded February 8,
petition for rehearing denied March 21, 1961

## SPROUL ET AL *v.* GILBERT ET AL
359 P. 2d 543

*Alfred B. Thomas,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the briefs were Robert Y. Thornton, Attorney General, and Donald H. Burnett, Assistant Attorney General, Salem.

*Roy Kilpatrick,* Canyon City, Oregon, argued the cause and submitted a brief for respondents.

John R. Hay, Ronald L. Orloff and Hart, Rockwood, Davies, Biggs and Strayer, Portland filed a

brief for Oregon Cattlemen's Association as amicus curiae.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and KING, Justices.

O'CONNELL, J.

This is a suit for declaratory relief under ORS 28.130, the Uniform Declaratory Judgments Act. Plaintiffs attack an assessment subjecting their interests in certain grazing lands in Grant county to an ad valorem tax imposed upon them under ORS 307.060. Defendants, the Grant county assessor and sheriff and the State Tax Commission, appeal from a judgment for plaintiffs.

The interests subject to be taxed are grazing privileges on lands owned by the federal government. These interests were created pursuant to Section 15 of the Taylor Grazing Act (43 USCA 315m) which authorizes the Secretary of the Interior to lease certain lands in the public domain for grazing purposes.

ORS 307.060, under which the tax was imposed, reads as follows:

"*307.060 Property of the United States held by a person under lease or other interest less than fee.* Real and personal property of the United States or any department or agency thereof held by any person under a lease or other interest or estate less than a fee simple, other than under a contract of sale, shall be assessed and taxed as for the full true cash value thereof subject only to deduction for restricted use. The lien for the tax shall attach to and be enforced against only the leasehold, interest or estate in such real or personal property. This section shall not apply to real or personal

property held by this state or any county, municipal corporation or political subdivision therein which is:

"(1) In immediate use and occupation by such political body; or

"(2) Required, by the terms of the lease or agreement, to be maintained and made available to the Federal Government, as a military installation and facility."

Plaintiffs contend that the grazing privilege granted to them by the Secretary of the Interior is not "a lease or other interest or estate less than a fee simple" described in ORS 307.060. They further contend that if their interests are subject to taxation under ORS 307.060 the statute is unconstitutional because it purports to levy a tax on the property of the United States, and because it discriminates against lessees of the United States.

The trial court held that ORS 307.060 is constitutional but that plaintiffs' interest "constitutes not a leasehold interest but merely a license to use the property for grazing."

Defendants appeal from that part of the judgment which declares that plaintiffs have no taxable interest; plaintiffs cross-appeal from that part of the judgment which declares that ORS 307.060 is constitutional.

The Taylor Grazing Act makes provision for the granting of two different types of grazing privilege, depending upon whether the land is within or outside an established grazing district. Where the land is within a grazing district the Secretary of the Interior is authorized by Section 3 of the Act (43 USCA § 315b) to issue a grazing *permit*; where the land is not included in a grazing district the Secretary is authorized by Section 15 (43 USCA § 315m) to *lease* it upon

such terms as he may prescribe. The pertinent parts of Sections 3 and 15 of the Taylor Grazing Act read as follows:

"Sec. 3 The Secretary of the Interior is authorized to issue or cause to be issued permits to graze livestock on such grazing districts to such bona fide settlers, residents, and other stock owners as under his rules and regulations are entitled to participate in the use of the range, upon the payment annually of reasonable fees in each case to be fixed or determined from time to time, and in fixing the amount of such fees the Secretary of the Interior shall take into account the extent to which such districts yield public benefits over and above those accruing to the users of the forage resources for livestock purposes. Such fees shall consist of a grazing fee for the use of the range, and a range-improvement fee which, when appropriated by the Congress, shall be available until expended solely for the construction, purchase, or maintenance of range improvements. * * * Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time numbers of stock and seasons of use. * * * So far as consistent with the purposes and provisions of this Act, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this Act shall not create any right, title, interest or estate in or to the lands. (43 USC., sec. 315b)
"* * * * *

"Sec. 15 The Secretary of the Interior is further authorized, in his discretion, where vacant, unappropriated, and unreserved lands of the public domain are so situated as not to justify their inclusion in any grazing district to be established pursuant to this Act, to lease any such lands for grazing purposes, upon such terms and conditions

as the Secretary may prescribe * * *. (43 USC., sec. 315m)"

The intention of Congress to provide for the creation of two distinct types of interest, i.e., the "permit" under § 315b and the "lease" under § 315m is apparent from an examination of other sections of the Taylor Grazing Act. The section which most clearly evidences this intent is § 315p. This section implements § 315g which authorizes the Secretary of the Interior to exchange grazing land for state land. § 315p provides as follows:

"§ *315p. Exchange of lands; issuance of patent subject to outstanding lease.*

"The Secretary of the Interior in adjudicating State exchanges, under section 315g of this title, involving lands embraced in *outstanding leases under section 315m* of this title issued prior to the filing of the State exchange application, is authorized upon the request of any State to issue patent to the State, *subject to such outstanding lease: Provided,* That the United States shall not by reason of the issuance of any such patents be required to account to the State for any money due and collected prior thereto *as rent* for any part of the then-current annual *rental period* except as was, on August 24, 1937, provided by law. (Aug. 24, 1937, ch. 744, 50 Stat. 748.)" [Emphasis added]

The use of the terms "outstanding lease," "rent" and "rental period" are, of course, indicative of an intention to regard the interests created under § 315m as leases. But what is more important, § 315p recognizes that § 315m leases create substantial interests in land and that the patent issued by the Secretary of the Interior is taken subject to that interest. The interest acquired under a § 315b permit is not excepted under § 315p because the grazing privilege acquired under

a permit is not an interest in land. Section 315b specifically provides that permits "shall not create any right, title, interest, or estate in or to the lands."

The difference between a permit and a lease is also recognized in § 315i which provides for a different disposition of the moneys collected under § 315b and under § 315m.

The distinction between the "permit" to graze authorized under Section 3 and the "lease" of grazing lands under Section 15 is reflected in the forms prepared by the Department of Interior for use in memorializing the grant of the privilege in each instance. The grant of a privilege to graze under Section 3 is made by two instruments which are entitled "———— Year Grazing Permit" and "Application For Grazing License or Permit." The latter, when endorsed, operates as the permit itself. The permit is granted for the grazing of a certain number of cattle during a designated period described in the permit as a certain number of animal-unit months. The permit does not describe a specific area of land upon which the permittee is entitled to run his cattle other than the designation of the grazing district to which he is limited. The privilege granted under a Section 3 permit is not exclusive; permits may be granted to more than one person for a single grazing district.

The form of instrument used to grant the right to graze under Section 15 is quite different. It is entitled "Application To Lease and Lease of Lands for Grazing Livestock." This application, when accepted by the federal agency, constitutes the lease itself. Unlike the grazing permit granted under Section 3, the lease contains a legal description of the land to which the grazing right extends in terms of range, township, section and government lots. The lessee has the ex-

clusive right to use the described land for grazing as against all other persons. Throughout the instrument the language commonly found in leases is used. In the application portion of the instrument the applicant "applies to *lease* all or any part of the lands described," and he agrees that his signature to the application shall also constitute an "acceptance of this *lease* when executed by the proper officer in behalf of the United States." At the foot of the application form a provision for acceptance is in the following language: "A *lease* for the lands described * * * is hereby issued subject to payments of *rental* due and to the provisions herein, for a period of —— years." The instrument contains various specific provisions defining the rights and duties of the "lessee," all of which are cast in the language of a lease. The "lessee" agrees to pay the required "rental"; if it is not paid within the time specified "the lease shall become null and void." Provision is made for a readjustment of the "rental" at the end of each three-year period. "Subleases" are not authorized and the lessee may not "assign this lease or any interest herein without the prior written consent of the signing officer." The default clause is similar in form to that found in leases: "If the lessee shall default in the performance or observance of any of the terms, covenants, and stipulations hereof, or of the regulations now or hereafter in force and such default shall continue 30 days after service or written notice thereof by the lessor, then the signing officer may terminate and cancel this lease." Likewise with respect to the clause indicating the intention that the promises run with the land: "It is further covenanted and agreed that each obligation hereunder shall extend to and be binding upon, and every benefit shall extend to and inure to the heirs,

executors, administrators, successors and assigns of the respective parties hereto." There is other language in the form which indicates that the creation of a leasehold interest was intended.

It appears, therefore, that not only does the Taylor Grazing Act itself indicate that Congress intended to provide for two distinct types of grazing privileges— a license under Section 3 and a lease under Section 15 —but also that the instruments used by the Department of the Interior in granting grazing privileges under the two sections are designed to carry out the legislative distinction.

■■ Admittedly the name which the parties attach to a relationship does not *ipso facto* determine the nature of the legal relationship created; the essential elements of the relationship in question must be present. The mere fact that the parties describe an instrument as a lease does not conclusively establish the existence of a leasehold interest. *Baseball Publishing Co. v. Bruton,* 302 Mass 54, 18 NE2d 362, 119 ALR 1518 (1938); *Lewis v. Baxter Laundries,* 254 Mich 216, 236 NW 239 (1931); *Whiteside v. Oasis Club,* 162 Mo App 502, 142 SW 752 (1912). But the language employed by the parties may be an aid to construction if the instrument is ambiguous. *Alfano v. Donnelly,* 285 Mass 554, 189 NE 610 (1934). In determining the intention of the parties, "[t]he courts construe the whole mass of words and not merely some of them." *Strandholm v. Barbey,* 145 Or 427, 441, 26 P2d 46 (1934).

In the case at bar plaintiffs contend that no interest in land was created by the grant of the grazing privilege to them and that plaintiffs are "licensees" only. The defendants argue that a leasehold interest was granted to each of the plaintiffs. Thus we are called

upon to determine whether a lease or a license was created.[1]

To create a leasehold interest the lessee must be granted the right of possession. A license is a revocable privilege to use land in the possession of another. Restatement of Property, Servitudes, § 514. It is commonly said that the lessee must have "exclusive possession," *Chain Belt Co. v. United States,* 115 F Supp 701, 708 (Ct. Cl. 1953); *White v. Maynard,* 111 Mass 250, 255, 15 Am Rep 28 (1872); *Mallam v. Trans-Texas Airways,* 227 SW2d 344, 346 (Tex Civ App 1949); *Conaway v. Time Oil Co.,* 34 Wash2d 884, 210 P2d 1012, 1017 (1949), but this is not strictly true because all possessory interests, including even a fee simple, are subject to limitations making the possessory right something less than exclusive. Translating "exclusive possession" to mean the right to exclude others, it is apparent that as against the lessor the exclusiveness of possession may vary depending upon the restrictions imposed upon the transferee's use by the creating instrument. *Seabloom v. Krier,* 219 Minn 362, 18 NW2d 88, 91 (1945); *Peterson v. Vak,* 160 Neb 450, 70 NW2d 436, 439, 51 ALR2d 1221 (1955), amended 160 Neb 708, 71 NW2d 186 (1955); 1 Tiffany, Real Property (3rd Ed) § 79. Even in the absence of express reservations in the creating instrument, the lessee's right to exclude others is less than complete for the landlord always has the right to enter to demand rent and to make repairs. 1 Tiffany, Real Property (3rd Ed) § 79. As we shall illustrate more specifically later, it is common in the creation of a leasehold in-

---

[1] It will be noted that ORS 307.060 makes taxable not only leaseholds but also "other interests less than a fee." Thus the language of the statute could be considered broad enough to include not only corporeal interests such as leaseholds, but incorporeal interests as well; if so construed, easements and profits a prendre would come within its terms. For reasons which we will detail below, we are of the opinion that ORS 307.060 is designed to tax only possessory interests.

terest to limit the lessee's use of the property to certain specified activities. In the sense that he does not have the privilege to use the property for proscribed activities, the lessee's possession is not exclusive. Further, even though the lessee's right to *use* the premises is not so restricted, his entire estate may be limited by the creating instrument so as to be subject to termination upon the occurrence of some stated event; and the stated event may involve no element other than an exercise of the grantor's volition. Restatement, Property, § 45, comment g. In such case the lessee's possession is exclusive, as to the lessor, only in a limited sense.

Where the right reserved in the transferor to terminate the transferee's interest is extensive, the line between a lease and a license becomes indistinct and the judicial effort to state the difference is often less than convincing. Contributing to the difficulty in classifying possessory and non-possessory interests in the occupation of land is the fact that possession does not have a fixed meaning. "Possession * * * is a variable term which may mean different things for different purposes." 1 American Law of Property, § 3.3, p 180.

A part of the variability in the meaning of possession arises out of the fact that possession has meaning only in terms of actual or potential use and because the uses to which land may be put vary from parcel to parcel. When the property is amenable to many uses, the right to use it for a single limited purpose might not constitute possession; yet, the same right to use may well be regarded as possessory if the land in question is susceptible to only a limited number of uses. And so, in the present case, since the land in question is of little use for anything other than grazing, mining

and recreation, the grant of the right to use it for grazing purposes embraces a substantial part of all of the practical uses to which the land may be put. Therefore, although such use is limited, it is relatively "exclusive."

In another context we have noted that the acts necessary to constitute possession must be related to the character of the land involved. In *Springer v. Durette,* 217 Or 196, 200-201, 342 P2d 132 (1959), a case involving claim to title by adverse possession, we recognized that the grazing of livestock upon wild land was sufficient to constitute possession. There we said that "[t]he claimant need only show that he 'has acted toward the land in question as would an average owner, taking properly into account the geo-physical nature of this land,' 6 Powell on Real Property, § 1018, p 731, considering the 'reasonable uses for which the land in question was suitable.' 6 Powell at p. 717." Similarly, in the case at bar, the character of the land in question must be considered in determining whether the plaintiffs' right to graze cattle constitutes a possessory interest.

We have examined separately each of the limitations on the lessees' use of the premises. It is possible, of course, that although a single restriction or limitation on use separately considered may not negative the lessee's so-called exclusive possession, the aggregate of two or more such restrictions and limitations may well do so. In the present case the restrictions and limitations taken together do not, in our opinion, reduce plaintiffs' interest to one which is merely non-possessory in character. There is no exact judicial gauge which can be set against the facts to prove our conclusion with mathematical precision. The exclusiveness of one's occupancy is a matter of

degree. We can only compare the respective ownership interests—principally the usufructuary rights—of the transferor and the transferee, and if we find that the transferee has been granted the privilege of occupancy together with a sufficient share of these interests we describe his right as "possession."

■■ The revocability of the occupant's interest is not a controlling factor in classifying it as a possessory or non-possessory interest. From the standpoint of the prospect of its termination the lessee's interest may, by the reservation in the lessor of a right of entry or right of revocation, be as precarious as the interest of a mere licensee. But this certainly does not preclude the transferee from taking possession, for a tenancy at will is a common and traditional estate in land. It is, then, the character of the occupant's right to use until his interest is terminated which is regarded as the significant factor. If, prior to termination, the transferor can rightfully interfere with every use the occupant might make of the premises, the interest is clearly a mere license. If any interference by the transferor is prohibited, the transferee's interest is clearly a leasehold. When a case does not present either of these extremes we are required to determine whether the right to use bargained for by the transferee is substantial enough to warrant giving him the benefits (or imposing upon him the burdens) which legal tradition has attached to possessory interests. Generally the substantiality of the occupant's interest is tested by the inquiry: Does he have sufficient control over the premises to warrant the label of possession? For the most part, this inquiry is judicially answered by matching the facts in the case before the court with other cases where a similar situation has been the subject of adjudication. Undoubtedly the

policy which will be served by classifying the interest in a particular way is frequently at the core of this matching process. Indeed, it has been suggested that the judicial process here is the reverse of that which we have assumed, and that a declaration of the occupant's rights or duties do not follow from the classification of his interest as possessory, but rather, that his interest is classified as possessory or non-possessory because it is decided for reasons of policy that he should or should not have certain rights or duties. *In re Owl Drug Co.,* 12 F Supp 439, 442 (D. C. Nev. 1935). See also, McDougal and Haber, Property, Wealth, Land (1948) pp 118, 342. Cf., Shartel, Meanings of Possession, 16 Minn L Rev 611 (1932).

■ Testing plaintiffs' interests upon the basis of the criterion of control, we are of the opinion that the "lease" created in them possessory interests. The creating instrument clearly reveals the intent to invest plaintiffs with the right to exclude others, including the grantor, except in the special circumstances recited. The reservation by the grantor of the right to reduce the grazing area or to permit other specified uses and the recognition of the privilege in others to use the premises for limited purposes do not, in our opinion, reduce plaintiffs' privilege to a mere non-possessory interest. In all other respects plaintiffs' rights were "exclusive." "Restrictions in the rights of tenancy which do not affect its fundamentals should not be interpreted as destroying the relationship." *In re Owl Drug Co.,* 12 F Supp 439, 445 (D. C. Nev 1935). Moreover, the duties imposed upon the "lessees" by the terms of the creating instrument are those normally devolving upon the possessor of land. Thus in the use of the land plaintiffs were required to take reasonable precaution to prevent grass, brush and forest fires and

to suppress them if they started. Likewise, they were obligated to comply with the laws with respect to the cost and maintenance of fences. And, they covenanted to maintain in good repair any range improvements on the leased premises.

Because of the concern for the public interest which government agencies have in the management of lands entrusted to their supervision, the leases which they execute cannot be expected to follow exactly the pattern of traditional commercial leases. Leasing arrangements such as the one before us are *sui generis* and the interest created in the transferee should not be declared to be non-possessory simply because it does not conform exactly to the interest created in lessees under the usual form of lease. Cf., Comment, Agreements for Leasing Departments in Retail Stores, 35 Mich L Rev 95, 101 (1936), where it is contended that such leasing agreements should be treated as *sui generis* to "enable them to serve adequately the modern business needs they are aimed to meet."

The exclusiveness of plaintiffs' possession is negatived to some extent by various provisions in the instrument permitting the lessor and third persons to use the premises under certain circumstances. The lessees agree "to allow authorized representatives of the Department of the Interior at any time to enter the leased lands for the purpose of inspection, and allow federal agents, as well as game wardens, at all times to enter the leased lands on official business." The reservation in the lessor of the right to enter leased premises for inspection purposes is commonly provided for in the execution of leases. Lieberman, Effective Drafting of Leases for Real Property (1956) IX-12, pp 166-168. The privilege of entry reserved to game wardens and federal agents is not to be inter-

preted as permitting entry which would materially interfere with the lessees' right of grazing and is, therefore, consistent with plaintiffs' substantially exclusive possession. The same may be said with respect to the provision permitting entry by "miners, prospectors for minerals, and other persons entitled to enter such area for lawful purposes" and permitting entry for hunting and fishing purposes.

The lessor reserves the right "to permit under applicable laws and regulations, the use and disposal of the mineral, timber, or other resources on or in the leased lands." It is very common in the grant of estates in both government and privately owned land to reserve mineral, timber and other natural resources. Lieberman, op. cit. supra, IV-17, pp 45-46, VI-7, pp 78-79. Therefore, we do not attach any persuasive significance to these reservations.

By the terms of the lease, the lessor reserves the right to "classify and dispose of, under applicable laws and regulations, pursuant to [public land laws] any part or all of the leased lands," provision being made for compensation of the lessee if such disposition is made. The lessor also reserves the right to reduce the leased area if it is "unreasonably excessive for the number of stock owned by the lessee, or if it is determined that such area is required for the protection of sources of water supply to communities, or for camping places, stock driveways, roads and trails, or town sites, or for feeding grounds near communities for the use of domestic livestock or near the slaughtering or shipping points for use of stock to be marketed or for other public purposes." In essence, these reservations create in the transferee an interest which is, on the occurrence of a condition subsequent, subject to a power of termination reserved in the grantor.

Many illustrations may be given of leases in which the lessor has the power to terminate the lessee's interest upon the occurrence of a stated event. The stated event may be, for example, the lessor's election to dispose of the land by sale, *Gostin v. Needle,* 185 Md 634, 45 A2d 772, 163 ALR 1013 (1946), or the insolvency, bankruptcy or receivership of the lessee, *Smith v. Hoboken P. W. & S. S. Connecting Co.,* 328 US 123, 66 S Ct 947, 90 L Ed 1125, 168 ALR 497 (1946). The reservation of such a power is not uncommon in government grants of estates. See, 43 USCA §§ 641-648; 43 USCA § 869; 16 USCA § 32. The reservation of the power to terminate the lessee's interest as to a part only of the land is likewise consistent with the grant of a possessory estate.

Of greater importance in classifying the occupant's interest is the control reserved by the transferor over the *use* of the premises, as distinguished from the reservation of a right to terminate the estate created. Here again the cases are bountiful recognizing a lease even though lessee's use is in some respects subject to lessor's control. The proposition is illustrated by the cases in which a part of the area in a store is "leased" to a concessionaire to be operated as a particular department. Although there is some conflict of authority, there are numerous cases holding that the concessionaire's interest is a leasehold. This result has been reached even though the lessor reserves the right to designate the space to be occupied at any time, *Beckett v. City of Paris Dry Goods Co.,* 14 Cal 2d 633, 96 P2d 122, 123 (1939); or to relocate the department, *In re Owl Drug Co.,* 12 F Supp 439 (D.C. Nev 1935); or to discharge lessee's employees, *Beckett v. City of Paris Dry Goods Co.,* supra, 96 P2d at 123; see also, *Stratis v. McLellan Stores Co.,* 311 Mass 525,

532, 42 NE2d 282, 142 ALR 1393 (1942); or supervise lessee's employees, *In re Owl Drug Co.,* supra, 12 F Supp at 444; or dictate lessee's credit policy, *In re Owl Drug Co.,* supra, 12 F Supp at 444; or requires that lessee turn over all receipts to the lessor's cashier, *Beckett v. City of Paris Dry Goods Co.,* supra, 96 P2d at 123; see also *Stratis v. McLellan Stores Co.,* supra, 311 Mass at 531-532; or that all business be conducted in the name of the lessor, *In re Owl Drug Co.,* supra, 12 F Supp at 444; or generally that the business is to conform to the standards of the lessor, *Meers v. Munsch Protzmann Co., Inc.,* 217 App Div 541, 217 NYS 256, 258 (1926).

Other adjudicated cases have recognized the creation of a lease where lessor has reserved a part of the use of the premises. *Harrelson v. Miller & Lux,* 182 Cal 408, 188 P 800 (1920) (lessor reserved use of a certain room in the leased dwelling and right to pasture four animals on the premises); *Polner v. Arling Realty,* 194 Misc 598, 86 NYS2d 891 (1949) (space in apartment building leased to installer of laundry equipment); *McKennon v. Anderson,* 49 Wash2d 55, 298 P2d 492 (1956) (lease of major portion of barn and surrounding yard).

There is ample authority for the proposition that a leasehold or other corporeal interest may be created even though the transferee has the right to use the premises only for a specified limited purpose. Leases commonly contain covenants limiting the use of the demised premises to specified purposes. *In re Owl Drug Co.,* supra (space in department store leased for toilet goods department); *Commercial Auto Loan Corp. v. Keith,* 79 Ga App 268, 269, 53 SE2d 381 (1949) (use restricted to "loans and automobile financing"); *Asa G. Candler, Inc. v. Georgia Theatre Co.,* 148 Ga

188, 189, 96 SE 226, LRA1918F 389 (1918) (to be operated "as a first-class theater catering to the best class of people"); *Heywood v. Fulmer,* 158 Ind 658, 32 NE 574, 18 LRA 491 (1902); ("exclusive right to all sand and gravel" for specified time "excluding all other parties from said premises held to be a lease); *Denecke v. Miller and Son,* 142 Iowa 486, 119 NW 380 (1909) (right to store electrical supplies in storeroom used by lessor for purposes of his own); *Tynes v. Kelly,* 116 So2d 54, 55 (La App 1959) (" 'to be leased as a "drug store" only' "); *Grossenbacher v. Daly,* 287 SW 781, 782 (Mo App 1926) (" 'to be used as a shoe retail store only, with the privilege of living in the rear' "); *Burns & Schaffer Amusement Co. v. Conover,* 111 NJL 257, 168 A 304 (1933) (for moving picture or theater business only); *Colonial Operating Corp. v. Hannon Sales & Serv., Inc.,* 178 Misc 879, 34 NYS2d 116, 117 (1942), reversed 178 Misc 885, 36 NYS2d 745 (1942), modified 265 App Div 411, 39 NYS2d 217 (1943) (to be used "only for a showroom for automobiles and automobile accessories"); *Lamken v. Miller,* 181 Wash 544, 44 P2d 190 (1935) (grant of concession to sell food at race track); *Greene Line Terminal Co. v. Martin,* 122 W Va 483, 10 SE2d 901 (1940) (lease of public wharf).

 In many cases where the privilege of use is limited to the severance of a part of the land itself the grantee's interest is described as a lease. *Lehigh Zinc & Iron Co. v. Bamford,* 150 US 665, 14 S Ct 219, 37 LEd 1215 (1893); *Nelson v. Republic Iron & Steel Co.,* 240 F 285 (8th Cir 1917); *Berwind-White Coal Min. Co. v. Martin,* 124 F 313 (3rd Cir 1903); *Lewes Sand Co. v. Graves,* 40 Del (1 Terry) 189, 8 A2d 21 (1939); *Heywood v. Fulmer,* supra; *Knight v. The Indiana, Etc., Co. et al.,* 47 Ind 105, 17 Am Rep 692

(1874); *State v. Royal Mineral Ass'n.,* 132 Minn 232, 156 NW 128 (1916); *In re Owsley's Estate,* 122 Minn 190, 142 NW 129 (1913); *State v. Evans,* 99 Minn 220, 108 NW 958, 9 Ann Cas 529 (1906); *Woodruff v. Gunton,* 222 Pa 384, 71 A 851 (1909); *Gilmore v. The Ontario Iron Company,* 86 NY 455 (1881). As said in *Heywood v. Fulmer,* supra, 158 Ind at 660, "A lease may not only confer upon the lessee the right to the occupancy of the leased premises, either generally for the time limited, or for some specific purpose, or in some specific manner, or the right to occupy and cultivate and to remove the products of cultivation, but it may confer upon him the power to occupy and remove a portion of that which constitutes the land itself." Where the grant consists only of the privilege of severing and removing a part of the land itself, the grantor retaining possession, the interest transferred is more properly regarded as a profit a prendre. See, *Bingham v. Salene,* 15 Or 208, 212-213, 14 P 523, 3 Am St Rep 152 (1887); Hahner, An Analysis of Profits a Prendre, 25 Or L Rev 217 (1946). Cf., *Saratoga State Waters Corporation v. Pratt,* 227 NY 429, 125 NE 834, 839 (1920). The grant of the privilege to pasture livestock on land which is possessed by the grantor is a profit a prendre. *Baker v. Kenney,* 145 Iowa 638, 124 NW 901, 903 (1910); *Deseret Livestock Co. v. Sharp,* 123 Utah 353, 259 P2d 607, 610 (1953); 1 Thompson, Real Property (Perm ed) § 270. In the case at bar the language of the "lease" reveals an intent to transfer to the plaintiffs, not only the right to graze but to exclude all others including the grantor, subject to certain limited and unsubstantial exceptions.

Oil leases which grant only the privilege to remove oil and gas from transferor's land are frequently held to create the relation of landlord and tenant. The

*People v. Phillips,* 394 Ill 119, 67 NE2d 281 (1946);
*Spence v. Lucas,* 138 La 763, 70 So 796 (1915); *Barns-dall v. Bradford Gas Co.,* 225 Pa 338, 74 A 207 (1909);
*Duke v. Hague,* 107 Pa 57 (1884). See a full discussion of the nature of oil leases in 1A Summers, Oil & Gas (Perm ed) §§ 151 et seq. Similarly, a tenancy is recognized where land is leased solely for mining purposes. *Malcomson v. Wappoo Mills,* 85 Fed 907 (C C S C 1898); *Stinson v. Hardy,* 27 Or 584, 41 P 116 (1895); *Northern Light Mining Co. v. Blue Goose Mining Co.,* 25 Cal App 282, 143 P 540 (1914); *Consolidated Coal Co. v. Peers et al.,* 150 Ill 344, 37 NE 937 (1894); *Head v. Little,* 312 Ky 10, 226 SW2d 322 (1950).

A conveyance of land for use as a railroad right of way only has been held to create a corporeal interest. *Central Pacific Railroad Co. v. Benity,* 5 Sawyer 118 (C.C. Nev. 1878); *Tennessee and Coosa R. R. Co. v. East Alabama R'y. Co.,* 75 Ala 516, 51 Am State Rep 475 (1883); *Alaska Cent. Ry. Co. v. Dooley,* 4 Alaska 184 (1910); *New York, Etc., R. R. Co. v. Trimmer,* 53 NJL 1, 20 A 761 (1890); *Rutland Railroad Co. v. Chaffee,* 71 Vt 84, 42 A 984 (1898). See, Comment, 30 Or L Rev 380 (1951).

We have already alluded to the case of *Springer v. Durette,* 217 Or 196, 342 P2d 132 (1959), in which the single use of land for grazing was deemed sufficient to constitute possession as a basis for title by adverse possession. If grazing is sufficient to constitute possession as a basis for originating title, it is sufficient to form the basis for the derivative ownership of a possessory estate.

Plaintiffs rely principally upon two Oregon cases distinguishing a lease and a license. In *Forsyth v. Nathansohn,* 139 Or 632, 633-638, 9 P2d 1036, 11 P2d

1065 (1932), plaintiff brought an action to recover $700 alleged to be due under a "lease" executed to defendant. The instrument upon which action was brought was entitled "Trapping Lease and Option." It was couched in the terms of a lease. The plaintiff " 'demised and leased * * * the Trapping Privileges on the following described lands.' " The "lease" was "for Trapping Purposes Only." Defendant covenanted to pay a specified sum "as rent." The instrument further provided that defendant was entitled to the occupancy of a log house located on the premises; plaintiff reserved " 'all grazing rights on said lands covered by this lease; and further reserves the right to trap coyotes and wildcats' ' "; defendant was authorized to assign the "lease" to a named party; plaintiff reserved the right to re-enter upon breach. Defendant's answer, which described the instrument in question as " 'a contract for trapping privileges in and around the marsh and lake known as Gray's Lake, Idaho,' " defended on the ground that he was induced to sign the instrument as a result of plaintiff's false representations. During the course of the trial defendant took the position that "[t]he document is a license rather than a lease." On appeal defendant argued that the instrument was a lease but that it was void because it did not definitely describe the land demised. The instrument described the land as "[n]ine hundred twenty-eight and 90/100 acres' " in three designated sections and all of another section, " 'a total acreage of 1,568.90.' " Defendant contended that the instrument could not be a lease because it did not locate the 1,568.90 acres in the sections mentioned. To answer this argument plaintiff contended that the instrument was "an exclusive license or privilege to go upon certain described lands for trapping purposes only." Then on rehearing

defendant argued that the interest created was a profit a prendre. The court conceded that if the agreement contemplated that the trapping was to be done on the plaintiff's land a profit a prendre would have been created. But the evidence disclosed that the trapping (for muskrats) was to be done in Gray's Lake; plaintiff's land to be used only as a means of access to the water. Faced with the confusion created by the shifting theories advanced by the parties, the court said on rehearing that "since it [the instrument] was reasonably capable of construction as a license, we adopted the construction of it suggested by the defendant in the circuit court and held it a license." The court added, "[w]e still believe that that conclusion is warranted."

We think that the court correctly held that a lease was not created. It seems clear that the parties did not intend that the possession of the 1,568.90 acres was to pass to the defendant. The reservation in the plaintiff of the right to trap and to graze animals quite clearly shows that plaintiff retained control over the premises. The fact that the privilege granted was for a limited type of use only does not, in itself, preclude the finding that a lease was created. But in the Forsyth case, unlike the situation in the case at bar, the transferor expressly reserved the right to graze cattle and to trap the predators which might endanger his herd. Moreover, considering the other possible uses of the land involved, including its use for grazing, the interest granted was considerably more narrow than the interest granted in the case at bar.

The other case relied upon by plaintiffs is *Strandholm v. Barbey*, 145 Or 427, 431-441, 26 P2d 46 (1934). There plaintiff, a gill net fisherman, sought to enjoin defendant from maintaining a wharf and several fish

traps which interfered with plaintiff's fishing operations in the Columbia river. Defendant rested his claim to use the river bottom on an instrument executed to him and another by the Secretary of War. The instrument contained the usual language of a lease. The "lease" was " 'for seining purposes only.' " It was " 'subject to revocation at will by the Secretary of War.' " The premises were described as " 'the land on the south side of the Sand Island Military Reservation, * * * as follows: All of that certain premises on the south shore of Sand Island together with rights, easements and appurtenances thereunto belonging, known as Sites Nos. 1, 2, 3, 4, and 5 * * *.' " The instrument contained various provisions relating to lessees' use of the premises; the use and occupation of the premises were subject to " 'such rules and regulations as the Commanding Officer, Fort Stevens, Oregon, may from time to time prescribe.' " The instrument recited that the lessees were permitted to erect " 'such temporary structures for the housing of their employees, animals, etc. as are absolutely necessary in connection with the seining operations.' " The number, location and dimensions of the structures were subject to the approval of the commanding officer and all work incident to their construction was to be performed under his supervision. There were other restrictions on lessees' use. The defendants contended that they had a leasehold estate in the island which gave them the riparian right to wharf out from the shore line. The court held that the instrument created a license and not a lease. The court held that the authorization to construct the wharf was not a declaration that the grantee could erect a wharf without first obtaining permission from the State of Oregon. It was held that since the title to the bed of the river was

owned by the state the lessee had no right to maintain the wharf below low water mark in the absence of a grant of authority to do so from the state. With the decision resting upon this ground it was not necessary for the court to describe the grantees' interest in the upland. The court's reasons for concluding that the grantees had a license only are not convincing. The court said:

> "The fact that the questioned rights are to be exercised upon a military reservation; the fact that the right is (1) personal to Barbey and the Columbia River Packers Association; (2) revocable at will; (3) permits the grantees to use the island for a single purpose only; (4) does not confer upon the grantees possession of the island; and (5) the fact that the right conferred stops short of granting to Barbey and his associates an estate in the land convinces us that the instrument creates a license and not a lease." 145 Or at 441.

The fact that the interest was "personal," i.e., non-assignable, or that it was revocable, or that it was for a single purpose does not, as we have shown, preclude the finding that a lease is created. The factors mentioned by the court under (4) and (5) in the quotation simply state the conclusion which the inquiry seeks to test.

Upon a re-examination of *Strandholm v. Barbey,* supra, we are of the opinion that the interest created there would more aptly be described as a leasehold rather than as a license.

We have found no cases expressly holding that the interest of a holder of a privilege to graze granted under the Taylor Grazing Act is a leasehold interest. However, in *Garcia v. Sumrall,* 58 Ariz 526, 121 P2d 640 (1942), the court assumes that a possessory interest is created in the grantee of a Taylor Grazing Act

lease. In that case plaintiffs received a "lease" for one year under the Taylor Grazing Act. Before the expiration of the one-year term plaintiffs made application for a renewal of the lease. After the year term had expired a new lease for five years was delivered to plaintiffs. During the period between the expiration of the old lease and the delivery of the second lease plaintiffs continued to pasture their livestock on the land covered by the lease. Defendants permitted their cattle to graze on these lands and plaintiffs brought an action of trespass. The court held that plaintiffs were "tenants from month to month after the expiration of their lease, and that their possession was good as against everyone except the landlord." 121 P2d at 643-644. The court did not purport to describe plaintiffs' interest during the term of the executed "lease" but it is evident that the court regarded this interest at that time as that of a lessee with the concomitant right of possession. Other cases involving grazing leases have treated the lessee's interest as an estate in possession. *Shreeve v. Greer,* 65 Ariz 35, 173 P2d 641 (1946) (contract to sell grazing leases held to be specifically enforceable); *American Mortgage Co. v. White,* 34 N M 602, 287 P 702 (1930) (grazing lease characterized as "chattel real" and held to be assignable in absence of a contrary provision in the lease); *Scharbauer v. Graham,* 37 N M 449, 24 P2d 288 (1933) (mortgage of grazing lease held to create a mortgage lien upon a renewal of the lease). See also, *Schell v. White,* 80 Ariz 156, 294 P2d 385 (1956); *Epletveit v. Solberg,* 119 Mont 45, 169 P2d 722 (1946); *State v. Vesely,* 40 N M 19, 52 P2d 1090 (1935); *Lea County Water Co. v. Reeves,* 43 N M 221, 89 P2d 607 (1939); *Mecom v. Gallagher,* 213 SW2d 304 (Tex Civ App 1947); *Sullivan Co. v. Meer,* 58 Wyo 90, 125 P2d 168

(1942). But cf., *J. M. Huber Petroleum Co. v. Yake,* 121 SW2d 670 (Tex Civ App 1938).

▮ Upon the basis of the foregoing analysis it is our conclusion that the interests acquired by the plaintiffs in the present case were possessory in nature and "held under a lease" within the meaning of ORS 307.060.

Plaintiffs contend that even if their interests are regarded as leaseholds, ORS 307.060 is unconstitutional on the ground that it violates the principle of federal immunity from state taxation and on the further ground that it discriminates against the federal government or those to whom its property is leased.

▮ ORS 307.060 does not directly impose a tax upon the federal government; the tax is upon the lessee. In the event that the tax is not paid the leasehold only is subject to foreclosure; the lien does not affect the interest of the federal government in the fee. See *United States v. City of Detroit,* 355 US 466, 78 S Ct 474, 2 L Ed2d 424 (1958). Cf., *United States v. Allegheny County,* 322 US 174, 64 S Ct 908, 88 L Ed 1209 (1944). Although a state may not levy a tax directly against the federal government or its property without the consent of Congress, *McCulloch v. Maryland,* 17 US (4 Wheat.) 316, 4 L Ed 579 (1819), the principle of immunity "does not shield private parties with whom it does business from state taxes imposed upon them merely because part or all of the financial burden of the tax eventually falls on the Government." *United States v. City of Detroit,* supra, 355 US at 469. The fact that the tax upon the lessee's right to use the land is measured by the "full true cash value" of the land itself does not invalidate the statute. *United States v. City of Detroit,* supra; *United States v. Township of Muskegon,* 355 US 404, 78 S Ct 483, 2

L Ed2d 436 (1958). See also, *City of Detroit v. Murray Corp.*, 355 US 489, 78 S Ct 458, 486, 2 L Ed2d 441, 460 (1958).

■ Plaintiffs' claim of immunity on the ground that they are instrumentalities of the federal government can not be sustained. Plaintiffs use the leased lands for their own private purposes; they do not in any sense represent the government of the United States in making such use. *United States v. Township of Muskegon,* supra.

■ Plaintiffs next argue that the imposition of a tax under ORS 307.060 upon lessees of the federal government results in discrimination because lessees holding under any lessor other than the federal government are not subjected to an ad valorem tax. As will be discussed below, ORS 307.110 imposes a similar tax upon lessees of property leased from the state or its subdivisions. Where land is owned by a non-exempt landlord the legislature has seen fit, as a matter of administrative convenience in collecting the tax, to provide for one assessment against the landlord rather than to separately evaluate and assess the interests of the landlord and tenant. Under such a method of assessment the legal incidence of the tax is upon the landlord but the assessment reflects the value of the interests of both landlord and tenant and the burden of the tax eventually falls, in part at least, upon the tenant in the form of higher rent. *Hammond Lumber Co. v. County of Los Angeles,* 104 Cal App 235, 285 P 896, 898 (1930). The entire interest in the land is subjected to tax, including the interest of the tenant; the tenant's interest is not treated separately for tax collection purposes simply to avoid the expense and inconvenience of a separate assessment. If the landlord's reversionary interest is tax exempt the state

may then choose to tax the lessee's separate interest. The lessee should not be permitted to escape the taxation of his interest merely because the reversionary interest of the landlord happens to be tax exempt. *De Luz Homes, Inc. v. County of San Diego,* 45 Cal2d 546, 290 P2d 544 (1955); *Hammond Lumber Co. v. County of Los Angeles,* supra; *San Pedro Etc. R. R. Co. v. Los Angeles,* 180 Cal 18, 179 P 393 (1919); Keesling, Property Taxation of Leases and Other Limited Interests, 47 Calif L Rev 470, 476 (1959).

Plaintiffs attempt to contrast ORS 307.060 with ORS 307.110 for the purpose of showing that the federal government is discriminated against in the imposition of the ad valorem tax. ORS 307.110 provides in part that "all real and personal property of this state or any institution or department thereof or of any county or city, town or other municipal corporation or political subdivision of this state, held under a lease or rented or held as an oyster claim by any person whose real property, if any, is taxable * * * shall be subject to assessment and taxation for the true cash value thereof uniformly with real property of nonexempt ownerships." ORS 307.060, it will be noted, imposes the tax upon real and personal property of the United States "held by any person under a lease or other interest or estate less than a fee simple." Plaintiffs' argument appears to be that ORS 307.060 taxes interests in land less than a leasehold, whereas ORS 307.110 taxes only leaseholds, with the exception of interests held as an "oyster claim," and that, therefore, there is discrimination against the government of the United States. It will be noted that ORS 307.110, in addition to subjecting leaseholds to taxation, also taxes property "rented * * * by any person whose real property, if any, is taxable * * *."

It might be argued that the disjunctive "or" between "held under lease" and "rented" indicates a legislative intent to include under the latter term the renting of interests other than a leasehold, which could include an "other interest or estate less than a fee simple" subject to tax under ORS 307.060. However, it is more likely that the terms "held under lease" and "rented" were intended to relate to the creation of possessory interests and we so interpret the statute.

The question then is whether ORS 307.060 was intended to embrace derivative interests from the federal government other than possessory interests, i.e., to include as being taxable interests easements, profits and other incorporeal interests. Considered separately, the term "or other interest" is broad enough to include non-possessory interest. However, we do not think that the term was used in ORS 307.060 in this broad sense. The statute provides that the interests described "shall be assessed and taxed as for the *full true cash value* thereof subject only to deduction for restricted use." (Emphasis supplied). We do not think that the legislature intended that one who has a mere incorporeal interest such as an easement or a profit is to be taxed the "full true cash value" of the land with a deduction for the "restricted use." We believe that the statute was intended to apply where the person holding under the United States had an interest of such dignity that it could be regarded as tantamount to a present temporary ownership warranting an assessment of it to him on the basis of its "full true cash value." Certainly the legislature did not intend to impose upon a mere easement holder, for example, an assessment and tax for the full value of the property, subject to deduction for the "restricted use." In such case the restrictions upon the easement holder's

use would comprise the entire possessory interest in the land. We construe the statute to include only interests which are capable of possession.

■ Assuming that we were to interpret ORS 307.060 as including non-possessory interests, still the plaintiffs would not be entitled to attack the statute. We have concluded that plaintiffs held leasehold interests. There is no difference in tax treatment under ORS 307.060 and 307.110 of persons holding leasehold interests. Therefore, plaintiffs would have no standing to attack ORS 307.060 even if it were construed to embrace non-possessory interests because they have not been taxed upon such an interest.

Plaintiffs rely upon *Phillips v. Dumas School Dist.,* 361 US 376, 80 S Ct 474, 4 L Ed2d 384 (1960), in support of their argument that the tax in question is discriminatory. In that case the state of Texas imposed a tax upon premises held by defendants under a lease from the federal government. The court found that under the tax statutes of Texas similarly situated lessees of property owned by the state and its political subdivisions were subjected to a "distinctly lesser burden." Lessees of state land were subject to tax only if the lease was for a term of three or more years, whereas all lessees of federal land, irrespective of the term, were obliged to pay the tax. Further, under the Texas statutes lessees of state lands paid a tax only on the value of the *leasehold interest,* whereas lessees of federal lands paid a tax on the *full value of the fee.* Finally, no tax was imposed upon lessees of the state where the lease was terminable at the lessor's option, whereas lessees of lands held under federal leases with such an option were taxed. We find no similar disparities under the Oregon statutes between the burden on lessees from the state or its political subdivisions

and lessees from the federal government. Plaintiffs have called to our attention instances in which our statutes specifically exempt from taxation the interest of lessees holding land under a lease from the state: ORS 307.110 (exempting "property leased to or rented by students attending a school or college operated under the direction of the State Board of Higher Education" and exempting leaseholds held by "employes of the state, municipality or political subdivision as an incident to such employment"). ORS 307.120 (exempting real property owned by municipalities and real and personal property owned by ports or dock commissions to the extent to which the property is leased for certain municipal purposes.

The principle that a state may not discriminate against the United States does not require the state in each instance where it enacts a statute exempting from taxation state land leased for certain public purposes to provide a similar exemption for lessees of federal land. It is very likely that in the enactment of most, if not all, of such exemption statutes the exemption did not include land leased from the federal government simply because it did not occur to the legislature that federal lands would be used for the purposes giving rise to the exemption. Moreover, the principle forbidding discrimination does not require a perfect parity of treatment in the taxation of the use of state and federal lands. The tax burden imposed on the users of federal land may be heavier than that imposed on the users of state land if the difference in treatment can be justified. As stated in the Phillips case, "[t]he imposition of a heavier tax burden on lessees of federal property than is imposed on lessees of other exempt public property must be justified by significant differences between the two classes."

*Phillips v. Dumas School Dist.,* supra, 361 US at 382. See also, Note, 29 U Cinc L Rev 381 (1960). We hold that the tax provided for under ORS 307.060 which was imposed upon plaintiff is not discriminatory.

The judgment of the lower court is reversed and the cause is remanded with directions to dismiss plaintiffs' complaint.

ROSSMAN, J., dissenting.

I am satisfied that the plaintiffs, who are livestock men, have no lease upon the government-owned grazing land with which this suit is concerned. I am also satisfied that the plaintiffs have no interest in that land against which an ad valorem tax can be assessed under ORS 307.060. I, therefore, dissent.

The majority's efforts to adapt the law of landlord and tenant to the needs of this case render it clear that that body of law does not fit this controversy unless liberties are taken with it which this court has never before seen fit to embrace.

Among the principles of real property law which may govern the relationship which is established when one person, who owns a tract of land, grants to his neighbor a right to pasture cattle upon it there is the principle known as profits a prendre. See "An Analysis of Profits a Prendre," 25 OLR 217. The majority states, "The grant of the privilege to pasture livestock on lands which is possessed by the grantor is a profit a prendre." That principle of law which is venerable with age and has been employed by this court appears to fit well this case. The American Law Institute has abandoned the title "profits a prendre" and refers to the principle as an easement. See Restatement of the Law, Property, § 450, comments f and g. Others refer to it simply as "a profit."

The function of the principle known as profits a prendre, to which I will refer as a profit, is to define the rights of two parties when one of them agrees that the other may enter upon his land and take therefrom, let us say, timber or coal. Likewise, it defines, as the majority concedes, the rights of parties when one neighbor grants to another the right to pasture cattle upon his land. In the present case the Secretary of the Interior (Bureau of Land Management) for a valuable consideration gave to the plaintiffs the right to pasture livestock upon the grazing land with which this suit is concerned. The plaintiffs' lands abut upon the government-owned grazing land.

If we employ in this case the law of landlord and tenant we will have to subject that body of law to some severe strains, and in the end will have to hold (in order to render the law of landlord and tenant applicable) that the plaintiffs had exclusive possession of the vast grazing lands involved in this suit. We will have to hold that they had exclusive possession notwithstanding the fact that:

1. Plaintiffs could use the land only for pasturage purposes and nothing else. In determining the significance of that fact we must bear in mind the statement in the majority opinion which says, "In the sense that he does not have the privilege to use the property for proscribed activities, the lessee's possession is not exclusive."

2. The plaintiffs must allow representatives of the Department of the Interior to enter upon the land at will.

3. The plaintiffs must allow "federal agents as well as game wardens" to enter upon the land at any time.

4. The plaintiffs must permit miners, prospectors and those who come to cut timber to enter upon the property and carry on their operations at

any time; the district manager of the Burns district of the Department of Interior, within whose jurisdiction the land in question is located, testified that the groups of individuals just mentioned had priorities over cattlemen.

5. The plaintiffs likewise must permit hunters and fishermen to enter upon and have access to the land in carrying on their pursuits.

6. The plaintiffs must permit the government to close the land if depletion of the forage is threatened by drought, epidemic, fire or other causes.

7. The plaintiffs must permit their acreage to be reduced or canceled altogether if the government finds it is excessive or that the land is needed to assure to a community a water supply or it is needed as the townsite for a community or as feeding grounds or for right-of-way purposes.

8. The plaintiffs must permit the cancellation of their rights if they lose, through any cause, the abutting land which they owned when they applied for the grazing rights.

Mr. Donald Z. Robins, of the Department of Interior, Burns Grazing District, which includes the lands in question, testified that there is some timber upon this land and that the Department was engaged in selling it. He explained that the purchaser, upon cutting the timber "must also make skid trails, roads, and so forth, across the lands." His testimony which is uncontradicted mentioned instances in which ranchers' rights have been cancelled or curtailed when it developed that the land could be used for better purposes.

Mr. Robins testified that in the grazing districts as well as in grazing land that lies outside of districts in Lake and Klamath Counties the rancher is not permitted to place stock upon the land before April 1 and must have it off by October 31. Thus, seven months

is the maximum period allowed for grazing. Since the rancher can use the land for grazing purposes only, his interest in it, whatever it may be, extends for seven months of the year only. Mr. Robins mentioned regulations promulgated by the Secretary which authorized the limitations just mentioned and stated that when sufficient personnel was available it would be put into effect in the area in question. He called attention to provisions of the plaintiffs' lease that enable the limitations to be put into effect in the present instance.

In the face of the above it is impossible for me to believe that the plaintiffs have exclusive possession of the grazing lands. The land, it will be observed, is useful not only for grazing but also for recreation, for the timber upon the land and for mining. It is clear that the government desires to maintain close scrutiny over the land through its agents so as to prevent overgrazing and destruction of wild life. Moreover, it is manifest that the plaintiffs have no need for exclusive possession. They desire only sufficient rights so that they may run their livestock upon the land and keep off the livestock of others. That result can be accomplished by a profit: Restatement of the Law, Property, § 450, comment b.

From the foregoing we see that the law of landlord and tenant should not be employed in this case. It is impossible to hold that the plaintiffs have exclusive possession without giving to that term a most startling meaning. Moreover, for this court to say that the plaintiffs have exclusive possession will subject them to a tax excessively large. They will be taxed for something for which they have no need whatever. Upon the other hand, the law of profits has governed similar situations through the centuries and fits the needs of this case.

This court has many times employed and expounded the principle of law known as profits a prendre. The first of our decisions upon that subject is *Bingham v. Salene,* 15 Or 208, 14 P 523, 3 Am St Rep 152, in which Chief Justice Lord, with his usual facility, set forth the doctrine in lucid manner. He stated:

"* * * Rights exercised by one man in the soil of another, accompanied with participation in the profits of the soil thereof—as rights of pasture or digging of sand—are termed profits a prendre. * * *"

In that case the owners of some land granted to the plaintiff the right to hunt wild fowl upon their land. The decision of our court held that the right thus given was a profit a prendre. *Winslow v. Fleischner,* 110 Or 554, 223 P 922, which also employed the rule of profits a prendre in the decision of the case, stated that *Bingham v. Salene* "is the leading case in this country upon the nature of the right to hunt. It is there held:

" "* * * the right to enter upon lands of another to cut grass, for pasturage, for the purpose of hunting, or for fishing in an unnavigable stream, is an interest in the land, or a right to take a profit in the soil.' "

*Winslow v. Fleischner,* supra, followed *Bingham v. Salene,* supra. *Forsyth v. Nathansohn,* 139 Or 632, 9 P2d 1036, 11 P2d 1065; *Salene v. Isherwood,* 74 Or 35, 144 P 1175, Ann Cas 1914B 542, 40 LRA NS 299; *Salene v. Isherwood,* 55 Or 263, 106 P 18; *Hume v. Rogue River Packing Co.,* 51 Or 237, 83 P 391, 92 P 1065, 96 P 865, 131 Am St Rep 732, 31 LRA NS 396, either employed the doctrine of profits a prendre or spoke of it as the law of this state. The Hume decision held that the right to use another's shore land for

drawing his nets thereon and thereby taking fish "is a *profit a prendre.*"

Instead of ruling that the agreement which the plaintiffs and the Secretary of the Interior (Bureau of Land Management) effected is a lease, we should hold it is a profit a prendre (easement). The majority has given no reason whatever for bypassing and in effect overruling the decisions just cited.

The real property against an alleged interest in which Grant County assessed a tax is owned by the federal government and is of the kind commonly called grazing land. It is more than 40,000 acres in area and is subject to the Taylor Grazing Act (43 USCA § 315 through § 315o). The plaintiffs, who are ranchers, graze stock upon the land under the privilege given to them by the instrument which I have mentioned. The instrument is entitled a lease, but it is agreed that its nature is a principle issue of this suit. The fact that the plaintiffs use the land under the agreement which I just mentioned caused Grant County to levy the tax challenged by this suit. The county claims that the plaintiffs have an interest in the land upon which an ad valorem tax can be assessed. The tax was levied under ORS 307.060 which authorizes the taxation of "a lease or other interest or estate less than fee simple" held by a person in real property owned by the government.

The document entitled lease which the plaintiffs and the Secretary signed contains some of the expressions which appear in leases. However, it is significant that terms such as "lease to," "demised and let to," "grant to," "rent to," "to have and to hold for a term of," which generally appear in leases that confer upon a lessee an interest, are wholly absent from this one. Likewise, the words "possess" and "posses-

sion" do not occur even once in this paper. The latter gives no indication of a purpose to confer upon the plaintiffs possession of the grazing lands, if by "possession" we mean exclusive possession and not merely the right to use. The paper employs such terms as "use of the lands," "grazing use" and "such authorized use."

In all likelihood the paper with which we are concerned was prepared carefully by a skilled attorney who is a member of the staff of the Department of the Interior. The fact that he avoided such expressions as "demised" and "possess" is significant. It is also significant that in lieu of speaking of possession he chose expressions such as "use of the land" and "grazing use." The words that appear in the instrument evince a purpose to give to the rancher a very limited use of the land, that is, a "grazing use" only.

The first page of the instrument in question is nothing more than a printed questionnaire in which the applicant gives his name, address, a description of the land which he owns, a description of the land which he seeks and a statement of the kind and number of the stock which he will pasture upon the land. In the upper right hand corner of the instrument in which the applicant is not permitted to write the Secretary enters the amount of the "rental" in the event that the application is granted. In the lower left hand corner the Secretary fills in the number of years (normally not more than ten) for which the applicant may use the land. In the event that the Secretary authorizes the signing of the instrument, then the latter becomes the "lease."

The remainder of the instrument consists of rules to which the rancher must conform in the event that he is given the use of the land. Those rules are largely

summations of the provisions of the Taylor Grazing Act and of the regulations which the Secretary has promulgated to facilitate the administration of that act. For example, this part of the instrument provides that (1) the rancher must not overgraze; (2) he must observe all of the laws and regulations for the protection of game animals and birds; (3) he must employ reasonable precautions to prevent grass, brush or forest fires; (4) he must use the land for grazing purposes only, etc. The rancher, upon gaining the right to use the land, would have to comply with those laws and regulations in all events.

The amount of "rental" which the rancher must pay is not determined by negotiation or bargaining, but through the use of a rule which the Secretary of the Interior has promulgated for that very purpose. Thus, it is seen that the so-called "lease" is not effected in the manner that agreements are normally brought about but in the manner in which ordinary licenses are obtained.

Obviously, in determining whether or not the document just summarized granted to the plaintiffs an interest in the grazing land against which an ad valorem tax can be assessed it will be necessary for us to consider the above mentioned provisions. But since the Taylor Grazing Act is the source of the Secretary's authority to enter into such agreements and governs all federal grazing lands, we must give attention to that statute. In fact, we must deem that it is a part of the instrument itself. In making the latter statement I have in mind the rule controlling the construction of agreements, authorized by statutes, which is expressed as follows in *Walker v. Whitehead,* 83 US 314, 21 L Ed 357:

"The laws which exist at the time and place of

the making of a contract, and where it is to be performed, enter into and form a part of it. This embraces alike those which affect its validity, construction, discharge and enforcement."

The following is taken from *Personal Industrial Bankers v. Citizens Budget Co.*, 80 F2d 327:

"We recognize that in construing a contract which rests upon statute, the statute must be read into the contract."

In 32 American Jurisprudence, Landlord and Tenant, § 127, page 130, the rule is expressed in these words:

"The rule that the existing statutes and the settled law of the land at the time a contract is made become a part of it and must be read into it except where the contract discloses a contrary intention has been applied to leases."

I do not believe that the majority observes the rule stated in those authorities. They give attention solely to the words of the instrument which the ranchers and the Secretary of the Interior sign. The majority makes the entire case turn upon its own definition of the word "possession" although it ascribes to that word a meaning which this court has never before recognized. I am satisfied that we must give attention not only to the paper but also to the provisions of the Taylor Grazing Act and the regulations concerning it which the Secretary of the Interior has promulgated. We must take into account that an important objective of the Taylor Grazing Act is the preservation of the natural grasses that grow upon our semi-arid lands and which render them grazing lands. If those grasses are destroyed the land may become a dust bowl. The act preserves the natural grasses through restricted, supervised grazing and by providing that a part (25 per cent) of the income produced by the

lands shall be expended for the latter's improvement. Regulation of the grazing is achieved in part through supervision of the rancher's use of the land. As the majority itself recognizes, "In the sense that he does not have the privilege to use the land for proscribed activities, the lessee's possession is not exclusive." Thus, we see that the rancher's use or possession of the land is not exclusive. Further, one of the purposes of the Taylor Grazing Act is the preservation of the wild life upon the grazing lands. In order to accomplish that purpose the rancher, as we have seen, must permit federal officials to enter at will upon the land. We have also noticed that several others, such as federal agents, miners, prospectors, hunters, fishermen, lumbermen, have rights to the use of the land that have priorities over the rancher's. Those circumstances which are gathered from the act and the regulations written by the Secretary show that the rancher does not have exclusive possession.

The Taylor Grazing Act was enacted in 1934, 48 Stats 1269. Its title indicates its purpose. It follows:

"To stop injury to the public grazing lands by preventing overgrazing and soil deterioration, to provide for their orderly use, improvement, and development, to stabilize the livestock industry dependent upon the public range, and for other purposes."

Prior to the enactment of the Taylor Grazing Act stockmen helped themselves to the open range. *Osborne v. United States,* 145 F2d 892, gives an account of the conditions which preceded and induced the passage of this act. That decision says:

"In the pioneer or 'emigrant' days of western America immense areas of unappropriated and otherwise unused territory were freely used by

stockmen for grazing. The government not only refrained from objecting to this practice but in various ways encouraged it and in time this privilege, to use the words of the Supreme Court in Buford v. Houtz, 133 U.S. 320, 326, 10 S.Ct. 305, 307, 33 L.Ed. 618, became '* * * an implied license, growing out of the custom of nearly a hundred years * * *.' This license was held to be the basis of various rights as between the licensee and other private individuals but not as between the licensee and the government."

The lax practice which flourished in that manner caused the evil of overgrazing. The principal purpose of the Taylor Grazing Act is the elimination of that evil.

The majority takes note of the fact that the Taylor Grazing Act is applicable to two types of government-owned land. One of the two types consists of large areas which § 315 of the act authorizes the Secretary to constitute into a grazing district. After he has placed the land in such a distirct it is referred to by the designation employed by the Secretary. The other type of land to which the act is applicable lies outside of grazing districts and is unsuitable for inclusion in any. It may be interspersed with privately owned land and is described in the Taylor Grazing Act in this way: "vacant, unappropriated, and unreserved lands of the public domain * * * so situated as not to justify their inclusion in any grazing district." The land involved in this suit is of the second type. The majority repeatedly indicates that the act requires that the two types of land must be dealt with in a materially different manner. The fact that they so believe indicates that they labor under a misconception of the meaning of the act. The majority, referring to

the permit which a rancher secures to run livestock upon grazing district lands, states:

"* * * The grant of a privilege to graze under Section 3 is made by two instruments which are entitled '———— Year Grazing Permit' and 'Application For Grazing License or Permit.' The latter, when endorsed, operates as the permit itself. The permit is granted for the grazing of a certain number of cattle during a designated period described in the permit as a certain number of animal-unit months. The permit does not describe a specific area of land upon which the permittee is entitled to run his cattle other than the designation of the grazing district to which he is limited. The privilege granted under a Section 3 permit is not exclusive; permits may be granted to more than one person for a single grazing district.

"The form of instrument used to grant the right to graze under Section 15 is quite different. It is entitled 'Application To Lease and Lease of Lands For Grazing Livestock.' This application, when accepted by the federal agency, constitutes the lease itself. Unlike the grazing permit granted under Section 3, the lease contains a legal description of the land to which the grazing right extends in terms of range, township, section and government lots. The lessee has the exclusive right to use the described land for grazing as against all other persons. * * *"

Although the majority states that the methods by which the two instruments are issued "is quite different," I am aware of no material difference. In each instance the rancher submits an application which states upon its face that when signed by the proper federal official it goes into effect in the one instance as a "permit" and in the other instance as a "lease." In each case the document itself states the number and type of stock which the rancher may place upon the land. It is true that the permit "does not describe

a specific area of land" and that the so-called lease contains a description. But, we noticed that a grazing district is an area which the Secretary's order has established and which is known by the designation which he gave to it. Therefore, it needs no description by metes and bounds in the permit. Upon the other hand, the second type of grazing land does not lie in any grazing district and must, therefore, be described in some manner. The amounts which the rancher pays for the privilege of pasturing his livestock, whether he uses a grazing district or the land which has not been organized into one, is substantially the same according to the unchallenged testimony of Donald Z. Robins, district manager for the Bureau of Land Management of the Burns District which includes the land in question. The testimony of Mr. Robins indicates that in administration grazing lands, whether in a grazing district or outside of one, are treated in substantially the same way.

The majority states that "permits may be granted to more than one person for a single grazing district." That is obviously true, because a grazing district includes tens of thousands of acres. Next, the majority states, the lessee "has exclusive right to use the described land." I believe that previous paragraphs of this opinion show conclusively that "the lessee" does not have exclusive possession. He must always yield priority to hunters, fishermen, miners, prospectors, officials of the Department of the Interior, agents of other departments of the government and loggers. These individuals may enter upon the land upon all occasions and enjoy there their prerogatives. The land in question consists of more than forty thousand acres. The Secretary of the Interior deems that approximately 5 acres are needed to provide forage for a cow.

The plaintiffs are seven in number and each has the right to run livestock in the great domain with which we are concerned. When one of the plaintiffs made his application to pasture in the area 500 cattle and 100 horses he described the area of land which he preferred as the pasture. He had no other means of designating what he wanted. The other plaintiffs followed the same course. In assuring himself against overgrazing the Secretary obviously had to know not only the number of livestock which the rancher wished to pasture but also the number of acres which he sought. That data in turn affected the amount to be paid by the rancher. Surely, nothing of significance, so far as this case is concerned, turns upon these simple facts.

The majority quotes § 315p of the act and argues that it shows that "lessees" have a "substantial interest" in the land. I find in § 315p no indication of a purpose to grant to the rancher "substantial interests" in the grazing land. Section 315q which pertains only to those who hold range land under permits and licenses provides that when their rights are canceled on account of appropriation of the land for war or national defense they "shall be paid out of the funds appropriated or allocated for such project such amounts as the head of the department or agency so using the lands shall determine to be fair and reasonable." That provision certainly does not indicate that the licensee or the permittee has any interest in the land or that his rights, whatever they may be, amount to a lease. Section 315q is comparable to § 315p and the two merely evidence the government's purpose to treat the ranchers fairly and take no advantage of them when it develops that the ranchers can no longer enjoy the grazing land.

The majority has amplified its citations to cases which were concerned with the Taylor Grazing Act. I have examined all of them. None are decisive of any issue involved in this case and none held that rights such as those possessed by these plaintiffs constituted a lease. *Northam Range Association v. Casey* (Nev) 339 P2d 384, which is not mentioned by the majority, comes the nearest of any of the precedents to speaking of the issues with which we are concerned. It declares it is "questionable" whether the ranchers' rights constitute a lease, but since "the distinction was not material" the court did not pass upon the issue. The fact that it went out of its way to declare it "questionable" is significant.

The above is the situation. I am satisfied that in determining whether or not the rancher receives an interest in the government-owned grazing land we must not confine our attention to the paper entitled "a lease" nor must we make the issue turn upon our understanding of the term "exclusive possession." That term does not appear in the paper entitled "a lease" and there is nothing in the circumstances revealed by the record that shows the rancher wished to gain exclusive possession. Likewise, the record fails to indicate that the Secretary of the Interior wished the rancher to have exclusive possession. We must give material attention to the Taylor Grazing Act and to the regulations which the Secretary has written pursuant to the authority conferred upon him by the act. When the act and regulations are studied it becomes clear that the act does not intend that the rancher shall have anything but the use of the land for grazing purposes together with sufficient other rights so that he may exclude intruders. It is true that the paper entitles itself "a lease" but when that

term was employed at the trial those who used it explained that it was necessary to use some sort of a word in referring to the relationship of the parties. The chances are that since it was necessary to entitle the paper in some way, the word "lease" was selected as the most understandable. To have labeled it a "profit a prendre" would have frightened the rancher away and defeated the purposes of those who sponsored the Taylor Grazing Act. But, upon entitling the paper a "lease" care was exercised to avoid the use of the terms that we have already mentioned, that is, terms such as "demise," "grant" and "possession." The word "use" was given prominence in the act.

I am satisfied that the relationship of the parties should be adjudged a profit a prendre.

Comment b to § 450, Restatement of the Law, Property, says:

> "An easement is an interest in land in the possession of another. It is not, itself, a possessory interest. The owner of it, therefore, is not entitled to the protection which is given to those having possessory interests. The fact that the owner of an easement is not deemed to have a possessory interest in the land with respect to which it exists indicates a lesser degree of control of the land than is normally had by persons who do have possessory interests. Thus, a person who has a way over land has only such control of the land as is necessary to enable him to use his way and has no such control as to enable him to exclude others from making any use of the land which does not interfere with his."

It will be noticed that the last sentence of the quoted paragraph expresses a rule which could meet the needs of the ranchers adequately and yet permit all to enter who have a right to do so under the provisions of the Taylor Grazing Act. A reading of the carefully con-

sidered opinion in *Red Canyon Sheep Co. v. Ickes*, 98 F2d 309, which was based upon the Taylor Grazing Act, can leave no doubt that the ranchers could exclude intruders even if the ranchers' rights amounted to nothing more than a license.

I dissent.

PERRY, J., joins in this dissent.