TANG, Circuit Judge:
 

 The City of San Francisco Market Corporation (the Market Corporation) appeals a bankruptcy court’s order, (which the district court affirmed), granting creditor’s (American Poultry) and Trustee’s Motions to Sell Lease, and denying lessor Market Corporation’s Motion for Reconsideration of an order extending the time to assume or reject the Lease. The Market Corporation argues that, since the Trustee failed to assume the “Lease” within the 60-day statutory period set by 11 U.S.C. § 365(d)(4)(Supp. IV 1986), the Lease was automatically rejected and the property should be surrendered by the Trustee. The Market Corporation further argues that the operation of Section 365 cannot be waived or, if it can be waived, no waiver occurred. Finally, it argues that conversion of the case from Chapter 11 to Chapter 7 does not commence a new 60-day period for assumption or rejection of the lease. We hold that the property interest embodied in the Lease Agreement is not subject to the operation of section 365(d)(4) and affirm.
 

 BACKGROUND
 

 The Market Corporation was incorporated in 1961, primarily to provide financial assistance to the City of San Francisco and to help relocate businesses which had been displaced by the City’s Golden Gateway Redevelopment Project, which today includes the Embarcadero Center, the Alcoa high-rise office building, the Hyatt Regency Embarcadero Hotel, and other structures. The City was under a legal obligation to relocate the industries being displaced by the project. One such industry was the San Francisco wholesale produce industry. The Market Corporation was responsible for buying out the owners of existing possessory rights in the area of the redevelopment project and for relocating the displaced businesses. The Market Corporation issued bonds to finance the construction of the San Francisco Produce Terminal (the Produce Terminal). It granted fifty year use rights in stalls of the Produce Terminal to the displaced and relocated businesses.
 

 Moreggia & Sons, Inc. (Moreggia), one of the displaced businesses, had entered into an agreement in 1962 with the Market Corporation for two store units in the Produce Terminal. On February 2, 1984, Moreggia assigned its rights under the agreement to American Poultry; on the same date, American Poultry assigned to Moreggia its rights under a second identical lease (the Lease in question in this case) for two other store units in the Produce Terminal.
 
 [1]
 

 The Lease Agreement was for a total term, including options, of 50 years. The basic monthly rent for each of the two store units was $275.00. The rate was calculated to provide the funds necessary to retire the bonds issued by the Market Corporation. The obligation to pay basic rent ceased upon retirement of Market Corporation’s bonded indebtedness. While the Lease terms authorize the Market Corporation to issue new bonds if necessary, such action would require the consent of two-thirds of the lessees.
 

 The agreement also provides for several additional obligations. These include payment of parking and utility charges and of a share of any possessory interest taxes assessed against the Market Corporation. Furthermore, if in any given year the Produce Terminal’s costs exceed the combined
 
 *1181
 
 value of certain Produce Terminal revenues and reserves, the lessee is required to pay his pro-rata share of the excess cost. The Produce Association is required to prepare and obtain approval for a yearly operating budget. The Lease provides, however, that the standards of repair and replacement and of operation of the Produce Terminal established in the Terminal’s first year of operation may not be substantially changed without the prior written approval of three-quarters of the lessees.
 

 The agreement further requires the lessee to maintain and repair the leased premises, to pay Produce Association membership fees, to pay a share of the Produce Association’s Automobile and Worker’s Compensation Insurance, and to provide liability and property damage insurance protection for, among others, the Market Corporation, the Produce Association and the City and County of San Francisco.
 

 On January 17, 1985, Moreggia filed a Chapter 11 bankruptcy petition. By then, the Market Corporation had retired its bonded indebtedness and Moreggia’s obligation to pay monthly basic rent had thus previously ceased. Moreggia had paid the Market Corporation a total of $130,000 in basic rent.
 

 On June 7, 1985, Moreggia filed a proposed reorganization plan. The plan was denied on November 8, 1985. On November 27, 1985, the case was converted to a Chapter 7 proceeding. Within sixty days of the conversion, the Trustee obtained an ex parte order extending the time within which to assume or reject any or all of Moreggia’s leases and executory contracts. On February 27, 1986, American Poultry applied for authorization for the Trustee to sell the Lease; on March 6,1986, the Trustee filed a motion to sell the Lease and to assume (if necessary) and assign the Lease. Moreggia, the Internal Revenue Service, and a group of junior lienholders joined in the motions of the Trustee and American Poultry. On March 7, 1986, the Market Corporation filed a motion to reconsider the ex parte extension of time to assume and/or reject unexpired leases and exec-utory contracts and also an opposition to the motion to sell the Lease. The Market Corporation contended that the Trustee had failed to assume the Lease within the 60-day statutory period required by 11 U.S.C. § 365(d)(4), and hence, the Lease was automatically rejected and the property should be surrendered to the Market Corporation.
 

 On June 11, 1986, the bankruptcy court issued an order granting the motions to sell the Lease and denying Market Corporation’s motion for reconsideration. The bankruptcy court held that the Lease “is a species of property not governed by the assumption-rejection provisions of [section] 365[ (d)(4) ].” The court further found that, if section 365(d)(4) applied, the Market Corporation had waived its operation. Finally, the bankruptcy court held that in any event the Trustee was entitled to assume or reject the Lease within 60 days of the conversion to the Chapter 7 proceeding. The Market Corporation appealed that decision to the district court.
 
 [2]
 
 The district court affirmed the bankruptcy court’s conclusion that the Lease is not an unexpired lease or an executory contract subject to Section 365(d)(4). It did not reach the remaining issues.
 

 ANALYSIS
 

 I.
 

 Standard of Review
 

 This court independently reviews the bankruptcy court’s decision.
 
 Ragsdale v. Haller,
 
 780 F.2d 794, 795 (9th Cir.1986). The bankruptcy court's findings of fact are reviewed under the clearly erroneous standard; its conclusions of law are reviewed
 
 de novo. Id.
 
 The interpretation of a statute is a question of law reviewed
 
 de novo. In re Southwest Aircraft Services, Inc.,
 
 831 F.2d 848, 849 (9th Cir.1987),
 
 cert. denied,
 
 — U.S. —, 108 S.Ct. 2848, 101 L.Ed.2d 885 (1988).
 

 
 *1182
 
 II.
 

 The Scope of Section 365(d)(4)
 

 We must decide whether the assumption-rejection provisions of section 365(d)(4) apply to this agreement. We begin our inquiry with an analysis of that section’s scope, i.e., to what types of agreements section 365(d)(4) applies. Section 365(d)(4) provides:
 

 ... in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
 

 The Market Corporation asserts that state law determines whether an agreement is a true lease.
 
 In re Mesa Refining, Inc.,
 
 52 B.R. 359, 362 (Bankr.D.Colo.1985) (using state law to determine whether an agreement is a lease or security agreement for purposes of Section 365). Under California law, the Market Corporation contends, this agreement qualifies as a true lease.
 
 See Bachenheimer v. Palm Springs, etc. Corp.,
 
 116 Cal.App.2d 580, 591, 254 P.2d 153, 159 (1953) (a lease is an instrument granting one the right, upon stated terms and conditions, to occupy property to the exclusion of the grantor). The Lease is not, according to the Market Corporation, a disguised security instrument which, arguably, would fall outside the purview of section 365.
 

 We acknowledge that the agreement qualifies as a lease under California state law. However, not every interest that might qualify as a lease under state law is subject to the automatic rejection provision of section 365. Our analysis of the Bankruptcy Code and the legislative history and purpose of section 365(d)(4) convinces us that the appropriate focus is on the federal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement.
 

 The Bankruptcy Code itself provides little guidance in this situation. The term “unexpired lease” is not defined. Section 365(m), however, provides that “for purposes of [section 365] ... leases of real property shall include any rental agreement to use real property.” The term “lease of real property” appears in section 502(b)(6), a provision which limits the amount of damages for unpaid rent a landlord can recover as a result of the termination of a lease of real property. 11 U.S. C. § 502(b)(6) (Supp. IV 1986).
 

 The
 
 Senate Report
 
 to section 502(b)(6) observes that as used in that section:
 

 the phrase ‘lease of real property’ applies only to a ‘true’ or ‘bona fide’ lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security....
 

 Whether a ‘lease’ is [a] true or bona fide lease or, in the alternative, a financing ‘lease’ or a lease intended as security, depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a ‘lease’.
 

 S.Rep. No. 989, 95th Cong., 2d Sess. 64,
 
 reprinted in
 
 1978 U.S.Code Cong. & Admin.News 5787, 5850.
 

 The requirement of a bona fide lease under section 502(b)(6) is applicable to section 365(d)(4). Rejection of an executory contract or an unexpired lease under section 365(d) constitutes a breach under section 365(g). The breach permits the creditor/landlord to seek allowance of its claim under section 502.
 
 See Collier on Bankruptcy
 
 (15th ed. 1986) ¶ 365.08, at 365-50, 51. As the Second Circuit observed in
 
 In re PCH Associates,
 
 804 F.2d 193, 199 (2d Cir.1986), the bona fide lease requirement of section 502(b)(6) is properly applied to sections 365(d)(3) and (4) because those sections, “read together, are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings.”
 

 Based on this reading, several courts have concluded that a proper inquiry under
 
 *1183
 
 section 365(d)(4) is directed towards the economic substance of a transaction to determine whether a true lease exists for purposes of the Bankruptcy Code. For example, in
 
 In re Independence Village,
 
 52 B.R. 715 (Bankr.E.D.Mich.1985), the court was faced with a “Lease Purchase Contract” between a municipal development corporation, the EDC, which financed the construction of a life-care facility for the elderly, and a debtor corporation, Independence Village, Inc., which operated the facility. The EDC borrowed the funds necessary to construct the facility by issuing tax-exempt bonds secured by a mortgage on the premises. A bank was designated as trustee for the bondholders. The EDC received legal title to the premises and leased them to Independence Village at a total rental equal to the amount sufficient to retire the bonds. For $100 Independence Village would receive a “deed” from the EDC once the bonds were fully paid. Independence Village filed a voluntary Chapter 11 petition. It did not move to assume or reject the lease within sixty days of filing the petition. The bank moved for relief under section 365(d)(4), arguing that the Lease should be deemed rejected and Independence Village should immediately surrender the property. The court concluded that the “Lease Purchase Contract” constituted a security agreement giving the EDC an equitable mortgage in the real property and a security interest in the personalty of Independence Village. Id. at 720. The court based its conclusion on its analysis of the intentions of the parties to the transaction,
 
 id.
 
 at 718, and the economic substance of the transaction,
 
 id.
 
 at 718-720.
 

 Similarly, in
 
 PCH Associates, supra,
 
 the Second Circuit held that a transaction memorialized in a “Sale-Leaseback Agreement” and a “Ground Lease” was not an unexpired non-residential lease within the contemplation of section 365(d)(4). 804 F.2d at 201. PCH owned and operated the Philadelphia Centre Hotel (the hotel) and owned the land upon which the hotel was situated. The hotel was offered for sale. A complex financing scheme was developed with outside investors to acquire, renovate, and provide working capital for the hotel. Through the “Sale-Leaseback Agreement” and the “Ground Lease” the land owned by PCH, but not the hotel, was sold to Purchase Estates, Ltd. (and later assigned to Liona) and immediately leased back to PCH. Liona therefore held title to the land and leased it to PCH, which owned and operated the hotel. The Ground Lease explicitly provided that the relationship between Liona and PCH was that of landlord and tenant.
 

 PCH filed for reorganization under the Bankruptcy Reform Act of 1978. One month later, pursuant to sections 365(d)(3) and (4), Liona filed an application seeking an order directing PCH to continue paying rent under the terms of the Ground Lease. PCH sought a declaration that the Ground Lease was not an unexpired nonresidential lease within the scope of section 365 of the Code, but rather constituted a joint venture or subordinate financing scheme. The bankruptcy court found that although the transaction was labeled a sale and a lease, its true nature was that of a joint venture and therefore no landlord/tenant relationship existed. The district court and the Second Circuit affirmed.
 
 Id.
 
 at 196, 201. The Second Circuit held that the Ground Lease was not a true or bona fide lease as contemplated by section 365(d)(4). It found it therefore unnecessary “to identify the transaction as a joint venture, security agreement, subordinated financing, or other investment scheme. Suffice it to say that it is not a bona fide lease for purposes of the bankruptcy Code.”
 
 Id.
 
 at 198-99.
 

 In this Circuit we have also declined to require assumption or rejection of a purported lease that is in substance a security agreement, even where the agreement has taken on the surface formalities of a contract or unexpired lease that might otherwise come within the reach of section 365.
 
 In re Pacific Exp., Inc.,
 
 780 F.2d 1482, 1487 (9th Cir.1986).
 

 These cases are not dispositive of the
 
 sui generis
 
 property interest embodied in this agreement. They do, however, provide a framework for analysis. Simply meeting the state law definition of a lease will not necessarily mandate the mindless application of section 365. Rather, the substance
 
 *1184
 
 of the agreement must properly fall within the scope of the type of agreement anticipated by Congress in enacting section 365.
 

 III.
 

 The Applicability of Section 365(d)(4) to this Agreement
 

 The exact nature of the interest created by this Lease Agreement is difficult to ascertain. However, based on the circumstances giving rise to the agreement, the substantive provisions of the Lease, and the Congressional purposes underlying section 365, the bankruptcy court did not err in concluding that the Lease is not a species of property governed by the assumption-rejection provisions of section 365. The evidence supports a finding “that the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship.”
 
 PCH Associates,
 
 804 F.2d at 200.
 

 A.
 
 The parties did not intend to enter into a typical landlord/tenant relationship
 

 The Lease Agreement was the product of unique circumstances. It in fact describes the nature of the transaction as “peculiar.” Lease Agreement, section 23, ¶ 6. The Market Corporation was created in 1961 as a non-profit organization. Its purpose was to aid the City and County of San Francisco in relocating the industries displaced by the City’s redevelopment project. To accomplish its mission, the Market Corporation sold bonds and used the proceeds to build the Produce Terminal. Displaced businesses, like Moreggia, were granted fifty year use rights in the new location. Moreggia was legally entitled to relocation space. The “basic rent” was set at $275 per produce stall per month until the bonds sold by the Market Corporation to finance the project were paid in full, at which time the obligation to pay fixed monthly rent ceased. The basic rental payments were not related to the value of the possessory right. The bond indebtedness has since been retired.
 

 No true landlord/tenant relationship was ever intended or created. The Produce Terminal was created to allow the City to fulfill its legal obligation to provide relocation space to the displaced businesses. The displaced businesses were grouped together in a cooperative fashion and charged only with the responsibility to pay for the costs of relocation and economically coexist with each other.
 

 B.
 
 The Lease Agreement no longer carries executory burdens
 

 The Lease had an initial term of twenty years. With the exercise of three successive options, the term could be extended for an additional thirty years. Thus, because the obligation to pay “basic rent” ceased with the retirement of the bonds, the stalls can be used without further payment until the ultimate termination of the Lease on September 30, 2013. The financial obligations remaining are
 
 de minimus
 
 relative to the value of the remaining pos-sessory interest in the stalls, which has been sold for $210,000.
 

 The Market Corporation’s designation of the remaining obligations as rent is unavailing. The parking and utility charges are not requirements of the Lease; they are incidental fees for optional additional services. The obligation under the Lease to pay excess repair and operating costs and possessory interest taxes are conditional and conceivably may never arise. Moreover, the standards of repair and replacement and of operation of the Produce Terminal as established in the Terminal’s first year of operation cannot be substantially changed without the prior approval of three-quarters of the lessees. Any significant Produce Terminal undertaking, therefore, is at the discretion of the lessees. The remaining obligations do not convert the prepaid right of possession for a substantial future term into an ordinary exec-utory lease with current and significant financial obligations.
 

 It is also worth noting that the Lease Agreement does not qualify as an exec-utory contract.
 

 For purposes of the Bankruptcy Act, an executory contract is one ‘under which the obligations of both the bankrupt and the other party to the contract are so far unperformed [at the time of filing] that the failure of either to corn-
 
 *1185
 
 píete performance would constitute a material breach excusing the performance of the other.’
 

 In re Coast Trading Co., Inc.,
 
 744 F.2d 686, 692 (9th Cir.1984) (citations omitted). Moreggia’s failure to meet any of the remaining obligations under the Lease would not entitle the Market Corporation to reclaim the property. There are adequate means to assure the debtor’s contribution to collective Produce Association activities without resorting to forfeiture of the vested property interest.
 
 [3]
 

 C.
 
 The purposes underlying section 365(d)(4) would not be served by including this agreement within its provisions
 

 Our holding is bolstered by the Congressional purposes underlying section 365. This court recently discussed the legislative history of the Shopping Center Amendments, which include section 365(d)(4). We observed:
 

 [b]efore 1984, debtors in Chapter 11 reorganizations had no fixed deadlines to assume or reject unexpired leases, although any party could request the court to fix a time limit. 11 U.S.C. § 365(d)(2) (1983). Congress became concerned about the practical consequences of Chapter 11 filings by tenants of shopping centers. It was particularly concerned that mall operators were facing periods of extended vacancies, that would last until such time as the bankruptcy courts would finally decide to take the initiative and force debtors to make a choice whether to assume or reject the leases. It was also concerned about the effects the extended vacancies were having on other tenants.
 
 See
 
 130 Cong.Rec. S8891, S8894-95 (daily ed. June 29, 1984) (statement of Sen. Hatch),
 
 reprinted in
 
 1984 U.S.Code Cong. & Admin.News 590, 598-99.
 

 In re Southwest Aircraft Services, Inc.,
 
 831 F.2d at 850.
 
 [4]
 

 Thus, the purpose of Section 365(d)(4) is to protect lessors from delay and uncertainty by forcing the trustee or debtor-in-possession to act quickly to assume unexpired leases.
 
 Id.
 
 at 851. On the other side of the equation, to ensure that the bankrupt estate is not unwittingly burdened with liabilities, an affirmative act of assumption by the trustee is required to bring executory contracts and unexpired leases into the estate.
 
 In re Lovitt,
 
 757 F.2d 1035, 1041 (9th Cir.1985),
 
 cert. den. sub. nom Cheadle v. Appleatchee Riders Association,
 
 474 U.S. 849, 106 S.Ct. 145, 88 L.Ed.2d 120 (1985).
 
 [5]
 

 Subjecting this agreement to the provisions of section 365(d)(4) would not further the legislative purposes underlying the section. The Market Corporation has suffered no delay, uncertainty, or other harm as a result of the failure to assume expressly the Lease within the 60-day period. Moreover, given that .the basic rent due on the Lease was no longer owed, and only minor expenses and dues were still owing, the Chapter 11 attorney was not aware that there were any burdens to assume pursuant to Section 365(d)(4).
 
 See Lovitt,
 
 757 F.2d at 1041.
 

 D.
 
 Equitable considerations counsel against forfeiture of this vested property interest
 

 The bankruptcy court properly invoked its equitable powers to look through
 
 *1186
 
 the form to the substance of the transaction.
 
 See In re Global Western Development Corp.,
 
 759 F.2d 724, 727 (9th Cir.1985) (as a court of equity the bankruptcy court may look through the form to the substance of a transaction and devise new remedies where those at law are inadequate). This is a case where the bankruptcy court’s equitable considerations should govern.
 

 Between the time of the original Chapter 11 petition and the conversion to Chapter 7, Moreggia made many attempts to sell its interest under the agreement. A plan for reorganization was proposed which involved the sale and assumption of Moreg-gia’s interest. The Market Corporation did not object to the efforts to sell the interest or the proposed plan. The bankruptcy court found that “[djuring this period of time, by silence, acquiescence and cooperation [the Market Corporation] acted consistently with an assumption on the part of all parties that the leasehold existed beyond the debtor’s 60 day statutory period within which to assume or reject.” Moreover, after the Trustee was appointed, the Market Corporation cooperated with the Trustee’s efforts to market the Lease. It offered the Trustee advice as to how to facilitate a sale and furnished the Trustee with lists of acceptable assignees. Moreggia has paid $130,000 and has fulfilled all of its material obligations under the agreement. In these circumstances, a forfeiture of the vested $210,000 property interest would be grossly inequitable.
 

 CONCLUSION
 

 We interpret section 365(d)(4) to apply only to true or bona fide lease situations.
 
 See In re PCH Associates,
 
 804 F.2d 193, 198 (2d Cir.1986) (sections 365(d)(3) and (4) of the Bankruptcy Code “apply solely to a ‘true’ or ‘bona fide’ lease”). Simply because this interest is not easily categorized as a security arrangement, a joint venture, a sale and leaseback, or other common financing scheme, does not compel the conclusion that it is a lease subject to the strictures of section 365.
 
 PCH Associates,
 
 804 F.2d at 198.
 

 The
 
 sui generis
 
 property interest embodied in the “Lease” is not subject to section 365(d)(4). This transaction involved a “peculiar” arrangement, Lease Agreement, section 23, 11 6, that created a property interest other than a bona fide leasehold. Moreggia’s interest is a prepaid right of possession for a substantial future term, (through the year 2013), with no
 
 material
 
 future obligations. The Agreement no longer carried executory burdens to assume or reject. The Market Corporation was not harmed by the failure to assume the benefits. Finally, a forfeiture of the $210,000 property interest, after full performance and payment, merely for failure to assume would be grossly inequitable.
 

 Because we hold that section 365(d)(4) does not apply to this Agreement, we do not reach the remaining issues.
 

 AFFIRMED.
 

 [1]
 

 . The agreement is labeled by the parties as a "Lease." We agree with the Trustee and American Poutry, however, that terms in the agreement such as “landlord,” “lease,” and “rent” are merely terms of convenience, used to avoid the awkwardness of supplying
 
 sui generis
 
 terms more reflective of the true nature of the Agreement. With that caveat, we will continue to use those terms.
 

 [2]
 

 . While the appeal was under submission, the Trustee, with authorization from the bankruptcy court, sold the interest in the two produce stalls for $210,000. The proceeds are being held in escrow pending disposition by this court.
 

 [3]
 

 . The Market Corporation did not appeal to the district court the bankruptcy court’s finding that the Lease is not an executory contract. Our discussion of the executory contract prong of section 365 is for completeness only.
 

 [4]
 

 . In
 
 Southwest Aircraft
 
 this court was faced with the question whether, where the debtor-lessee moved within the 60-day period allotted by section 365(d)(4) for an extension of time within which to assume or reject its commercial lease, but the bankruptcy court did not hear the motion until after the 60-day period had ended, the bankruptcy court retained the authority to consider and grant the extension. This court held, after extensive analysis of section 365(d)(4) and its legislative history and purpose, that the bankruptcy court retains the authority to consider and grant a timely filed extension even after the 60-day period expires. 831 F.2d at 853.
 

 [5]
 

 .Lovitt
 
 was decided under the Bankruptcy Act of 1898, as amended, 11 U.S.C. § 1 ei
 
 seq.
 
 (1970). The
 
 Lovitt
 
 court, however, used analysis employed by courts in cases arising under Section 365(d) of the Bankruptcy Code.
 
 Lovitt,
 
 757 F.2d at 1041.