862 F.2d 217
 18 Bankr.Ct.Dec. 947, Bankr. L. Rep. P 72,502
 In re HARRIS PINE MILLS, Debtor.
Bertha BAKER, Dean Forth, Louise Forth, Tommie Gibson and
Betty Gibson, Appellants,
v.
HARRIS PINE MILLS, Defendant-Appellee,
and
Unsecured Creditors Committee, Appellee.
 No. 87-4359.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1988.
Decided Nov. 30, 1988.
 
 W. Eugene Hallman, Mautz, Hallman & DeVore, Pendleton, Or., for appellants.
 Leon Simson, Richard Samuels, Ransom, Blackman & Simson, Portland, Or., for defendant-appellee.
 Mildred Carmack, Schwabe, Williamson & Wyatt, Portland, Or., for appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before SCHROEDER, PREGERSON and LEAVY, Circuit Judges.
 LEAVY, Circuit Judge:
 
 
 1
 Several landowners claim that their agreements with the debtor, Harris Pine Mills, constitute leases under federal or state law, and that the Trustee failed to timely assume the leases pursuant to 11 U.S.C. Sec. 365(d)(4) (Supp. IV 1986). The bankruptcy court and the district court held the Trustee was under no duty to assume the leases within the time constraints of section 365(d)(4), because the agreements were not leases for purposes of section 365. We affirm.
 
 FACTS AND PROCEEDINGS
 
 2
 From 1947 to 1978 the debtor, Harris Pine Mills (Harris Pine), and five landowners entered into agreements that enabled Harris Pine to conduct logging activities on Oregon lands. The pre-1957 agreements generally give Harris Pine the rights to merchantable timber, and to construct and maintain roads for a specified number of years.[1] The post-1957 agreements differ from the earlier ones in two significant respects. First, the agreements grant Harris Pine the right to extend the duration of the agreements upon payment of additional consideration at or near the end of the agreement's term. Second, the agreements redefine merchantable timber to include not only timber existing at the time of entering the agreement, but also timber that may grow during the life of the agreement.
 
 
 3
 All agreements refer to Harris Pine as the "purchaser" or "grantee" and to the landowners as the "sellers" or "grantors." The agreements required Harris Pine to pay full consideration at the time of entering the agreement.
 
 
 4
 Harris Pine filed for bankruptcy under Chapter 7 on December 5, 1986. On December 11, 1986, the matter was converted into a Chapter 11 proceeding. Under section 365(d)(4) of the Bankruptcy Code, the Trustee has 60 days to assume non-residential leases; otherwise such leases are deemed rejected.[2] The Trustee obtained an extension for time in which to assume or reject Harris Pine's leases on February 4, 1987. On March 6, the Trustee gave notice of the extension to other lessors, but not to the landowners involved in this case.
 
 
 5
 On March 30, the Trustee moved to assume Harris Pine's agreements with the landowners. The landowners objected, contending that the agreements were non-residential leases, and that the Trustee had failed to timely assume the leases under section 365(d)(4).[3] However, the bankruptcy court and the district court, 79 B.R. 919, ruled that none of the agreements were non-residential leases, so that there was no duty to assume them within 60 days under that section.
 
 STANDARD OF REVIEW
 
 6
 The facts in this case are undisputed. We are in as good a position as the district court to review the bankruptcy court's decision, and we review that court's conclusions of law de novo. Ragsdale v. Haller, 780 F.2d 794, 795 (9th Cir.1986).
 
 DISCUSSION
 
 7
 We must decide whether the agreements between Harris Pine and the several landowners were non-residential leases for purposes of section 365(d)(4) of the Bankruptcy Code.
 
 
 8
 Under section 365 a Trustee can assume or reject the debtor's executory contracts and unexpired leases. Rejection of an unexpired non-residential lease results in termination of the lease, "and the trustee shall immediately surrender such non-residential real property to the lessor." Sec. 365(d)(4). Rejection can be automatic upon untimely assumption of the lease:
 
 
 9
 [I]n a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected....
 
 
 10
 Id.
 
 
 11
 The landowners in this case seek to terminate Harris Pine's rights in their lands. They characterize their agreements with Harris Pine as non-residential leases, and argue that the Trustee failed to timely assume the agreements under section 365(d)(4). Thus, they ultimately seek to compel the Trustee to surrender the real property to themselves as lessors. Harris Pine maintains that the agreements are not leases.
 
 I. Applicable law
 
 12
 The parties dispute whether the agreements should be analyzed under the Bankruptcy Code or Oregon law. The landowners claim that, regardless of state law, Congress intended to include agreements such as the ones before us under section 365(d)(4). Specifically, they point to section 365(m), which provides:
 
 
 13
 For purposes of this section 365 ..., leases of real property shall include any rental agreement to use real property.
 
 
 14
 In support of their argument, the landowners cite In re Gasoil, Inc., 59 B.R. 804 (Bankr.N.D.Ohio 1986). Gasoil involved oil and gas leases under which a debtor paid landowners a yearly rental if it did not pump oil, or royalties if it did. Id. at 805. The court quoted section 365(m) and said: "[I]t does not matter whether these oil and gas leases are viewed as licenses ... or as leases. For purposes of section 365 they are 'leases' since they at least convey a right to use real property." Id. at 806.
 
 
 15
 We do not read Gasoil to say that state law is irrelevant to section 365(m). By its terms, section 365(m) covers agreements that are both (1) rental agreements; and (2) for the use of real property. In the passage quoted, the Gasoil court was deciding whether the leases conveyed a right to use real property, i.e., the second requirement of section 365(m). But the court relied on state law to establish a lease, taking into account, among other things, the rent obligations of the debtor:
 
 
 16
 However, Ohio cases have said that th[is type of gas and oil] interest is a leasehold rather than a fee interest.... In all of the agreements the royalty is to be paid monthly, and in any year where there is no production, the annual rental must be paid. This makes the agreement run in successive periods of one year. Thus, these agreements seem to be more in the nature of automatically renewing periodic tenancies than in the nature of determinable fees.
 
 
 17
 Id. at 807-08. Thus, Gasoil does not support the view that state law is irrelevant to establish a rental agreement or lease under sections 365(m) or 365(d)(4).[4]
 
 
 18
 The landowners' position would be stronger if the Bankruptcy Code specified what constitutes a rental agreement or a lease under sections 365(m) or 365(d)(4). But they have not argued that such a rock-bottom definition exists, nor have we found any guidance in the Code or the legislative history.[5] See 11 U.S.C. Sec. 101 (1982 & Supp. IV 1986); H.R.Conf.Rep. No. 882, 98th Cong., 2d Sess. 33 (1984); 130 Cong.Rec. S8887, 8894-8895 (daily ed. June 29, 1984), reprinted in 1984 U.S. Code Cong. & Admin. News 576, 590, 598-99; S.Rep. No. 70, 98th Cong., 1st Sess. 1-23 (1983); S.Rep. No. 65, 98th Cong., 1st Sess. 27-43 (1983).
 
 
 19
 Where "Congress has not chosen to exercise its power to fashion [a bankruptcy] rule[,] ... [it] has generally left the determination of property rights in the assets of a bankrupt's estate to state law." Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979). The appellant landowners have not provided any reason why Oregon law supplies an inappropriate standard. It is therefore our view that, to fall under section 365(m), the landowners must show that their agreements are rental agreements or leases under Oregon law.[6]
 
 II. Oregon law
 
 20
 Both the landowners and Harris Pine agree that no Oregon case has ever held that timber agreements are leases. See Belt v. Matson, 120 Or. 313, 319, 252 P. 80, 82 (1927) (timber contract to sell standing timber and giving buyer five years to remove the timber is a sale and not a revocable license); Reid v. Kier, 175 Or. 192, 207, 152 P.2d 417, 423 (1944) (timber considered goods covered by Uniform Sales Act only if timber severed under the sale contract); Paullus v. Yarbrough, 219 Or. 611, 637, 347 P.2d 620, 633 (1959) (severance must be prompt for a timber contract to fall under the Uniform Sales Act). The Oregon Supreme Court, however, dealt comprehensively with leases in Sproul v. Gilbert, 226 Or. 392, 359 P.2d 543 (1961). The landowners claim that the agreements before us are leases under that case.
 
 
 21
 The plaintiff in Sproul enjoyed grazing privileges on federal land. The Oregon assessor taxed the privileges pursuant to an Oregon statute taxing leasehold interests in federal property. The plaintiffs claimed their interest was not a leasehold, but a license. The court established three principles of Oregon leasehold law: (1) to create a lease, the lessee must have the right of possession, though possession need not be exclusive as to all uses of the land, id. at 403, 411, 359 P.2d at 549, 552; (2) if the holder retains a particular use of the land, whether the use is exclusive enough to create a lease depends on that use's importance relative to other possible uses of the land, id. at 404, 359 P.2d at 549-50; and (3) exclusive use amounting to possession may be negated if the transferor reserves restrictions on the transferee's use. Id. at 408, 359 P.2d at 551.
 
 
 22
 The landowners claim the agreements fit the Sproul definition of leases, because Harris Pine's logging operations were exclusive enough to amount to leasehold possessions. As evidence of exclusivity, they point to Harris Pine's extensive rights under the agreements: the right to merchantable timber existing at the time of entering the agreement and throughout the agreement's duration; the prolonged nature of the interests, when the possible extensions are taken into account; the right to construct mills and roads for logging activities; and other interests.
 
 
 23
 Even were we unquestioningly to accept the landowners' description of the agreements, the landowners' argument must fail. Crucial to the Sproul analysis was an evaluation of all the possible uses of the land. The Sproul court said:
 
 
 24
 When the property is amenable to many uses, the right to use it for a single limited purpose might not constitute possession; yet, the same right to use may well be regarded as possessory if the land in question is susceptible to only a limited number of uses.
 
 
 25
 Id., at 404, 359 P.2d at 549-50. Here, the landowners have failed to produce any evidence of the other possible uses of the lands. They thus failed to show that Harris Pine's use was so important, relative to other possible uses, as to be possessory. As the district court noted, "[s]ome timberlands in Oregon may lend themselves predominantly or perhaps exclusively to timber; others may support a wide variety of residential, agricultural, mineral, or other interests.... The evidence in this case does not support a finding that as a matter of law or fact the debtor's interest was sufficiently possessory to rise to the status of a leasehold." In re Harris Pine Mills, 79 B.R. 919, 922-23 (D.Or.1987). We agree.
 
 CONCLUSION
 
 26
 We conclude that whether an agreement is a lease or rental agreement for purposes of sections 365(m) and 365(d)(4) of the Bankruptcy Code generally depends on state law. The landowners here have not shown why Oregon's definition of a lease or rental agreement provides an inappropriate standard in their case. Since the landowners fail to show that the agreements at issue are leases under Oregon law, they likewise fail to show the agreements qualify as leases under sections 365 or 365(d)(4).
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 One of the agreements, however, also gave Harris Pine the right to erect a mill
 
 
 [2]
 Assumption of the lease preserves the rights and obligations of the debtor. See generally 2 Collier on Bankruptcy p 365.01 at 365-10 to 365-12 (15th ed. 1988). Rejection terminates the lease, obligating the trustee to surrender the property to the lessor. Sec. 365(d)(4)
 
 
 [3]
 Harris Pine does not dispute that, if the agreements are leases, the Trustee's failure to notify the landowners of the extension makes December 11, 1986 the operative date from which to calculate Sec. 365(d)(4)'s 60-day limit as to the landowners. Thus, notice of intention to assume on March 30, 1987 would have been too late. The Unsecured Creditors Committee argues that the 60-day period begins to run on March 6, the date of notice to other lessors. We do not decide the issue because our conclusion that the agreements are not non-residential leases removes them from the 60-day limit of Sec. 365(d)(4)
 
 
 [4]
 The landowners here seek to establish a rental agreement under Sec. 365(m) by claiming that Harris Pine's payments under the agreements were rent. Nothing supports the landowners' contention. The agreements refer to the transactions as "sales" and to the parties as "sellers" and "purchasers" or "grantors" and "grantees." Moreover, Harris Pine paid in full at the execution of the agreements, rather than making the periodic payments typical of a rental agreement. That rent in Oregon may be fully paid in advance, by itself, is no proof that what was paid in advance was rent, especially when all factors suggest a sale
 
 
 [5]
 The courts have required that under Sec. 365(m) and Sec. 365(d)(4), a lease must be a bona fide lease, i.e., a lease because of the economic substance of the transaction rather than because the transaction is labeled a "lease". See In re Moreggia & Sons, Inc., 852 F.2d 1179, 1186 (9th Cir.1988) (sui generis agreement labeled "Lease Agreement" failed to qualify as a Sec. 365(d)(4) lease); In re PCH Associates, 804 F.2d 193, 200-01 (2d Cir.1986) (sale-leaseback transaction and "Ground Lease" not a Sec. 365(d)(4) lease since no true landlord tenant relationship). See also S.Rep. No. 989, 95th Cong., 2d Sess. 64, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5850. But, what constitutes a lease or a landlord tenant relationship as a matter of economic substance, depends on state law, not on the Bankruptcy Code, absent statutory authority. See Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)
 
 
 [6]
 Once it is determined that according to state law an agreement is a lease, further analysis may be warranted in Sec. 365(d)(4) cases. For example, in In re Moreggia & Sons, Inc., 852 F.2d 1179, 1184-86 (9th Cir.1988), we held that a lease under state law was not a Sec. 365(d)(4) lease because (1) it lacked a landlord tenant relationship; (2) the debtor had no further executory burdens; (3) the intent behind Sec. 365(d)(4) was inapplicable; and (4) equitable considerations. We do not reach that stage of analysis here, where the agreements do not qualify as leases under state law