In re **PRESTIGE POINT,** a joint venture, Debtor-in-Possession.

**BEAR VALLEY MUTUAL WATER COMPANY,** Plaintiff,

v.

**PRESTIGE POINT,** a joint venture, **James Hunter Construction Corporation, Inc.,** a California corporation, **P.B. Wagner,** in his capacity as Trustee, **Defendants.**

**Bankruptcy No. SB 86–07275–LR. Adv. No. SB 89–0087 LR.**

United States Bankruptcy Court, C.D. California.

April 27, 1990.

David G. Moore, Reid & Hellyer, Riverside, Cal., for plaintiff.

J. Patrick Maginnis, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION GRANTING DECLARATORY RELIEF AND FINDING DEBTOR HAS NO INTEREST IN THE MASONIC LEASE

LYNNE RIDDLE, Bankruptcy Judge.

### JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1334. Further, since the question to be resolved involves Debtor's rights in property, this matter is a core proceeding which may be resolved by the Bankruptcy Court. 28 U.S.C. Section 157(b)(1).

### BACKGROUND FACTS

Debtor, Prestige Point, a joint venture, filed a voluntary petition for protection under Chapter 11 of Title 11 U.S.C. on December 12, 1986. The venture between James Hunter Construction Corporation and James O. Buckels, an individual, was formed in 1980 for the purpose of acquiring a certain parcel of real property consisting of approximately 10 acres of mountain lakefront property located on Big Bear Lake, County of San Bernardino, California (hereinafter referred to as "the property").

At all times relevant the property is and has been owned by Bear Valley Mutual Water Company (hereinafter "Bear Valley").

Prestige Point asserts that at the time of its filing it was lessee of the property under two lease agreements with Bear Valley as Lessor; (1) a lease entitled "Ground Lease", dated May 1, 1983 with Prestige Point as tenant, and (2) a lease dated March 31, 1964 with L.J. Smith and Masonic Homes of California as tenants (hereinafter "Masonic lease"). After March 1964 the Masonic Lease was assigned on several occasions; Debtor became assignee of the leasehold on December 16, 1980.

Debtor's B–1 Schedule describe its claimed interest in the property as "... [a] potential 75 year lease with Bear Valley ... of approximately 12 acres of lakefront property". Debtor made no specific mention in its petition, schedules or statements of the two separate leases—the Masonic and Ground (hereinafter jointly called "the leases"). In 1987, however, Bear Valley filed a complaint for declaratory judgment alleging Debtor has no remaining interest in the property. Prestige Point disagrees.

Because the leases differ widely, a specification of some differences is helpful in making the determination requested. The Masonic lease, consisting of seven pages, grants an initial term of 22 years from May 1, 1964 to April 30, 1986, and further provides, upon certain conditions, a 25 year option to renew. The rent for the full 22 year term is $48,400; $2,200 payable in advance on May 1st of each year. The use for the property under the Masonic agreement is expressly set out in the Fourth paragraph, which provides among other things, that:

"(c) The premises are leased for the sole purpose of the maintenance of housekeeping rooms, lodge rooms, and dining and sleeping quarters customarily used in the operation of an institutional mountain camp. Tenant shall not use or permit said premises or any part thereof, to be used for any purpose or purposes other than herein provided....

"(d) Tenant shall not make, or suffer to be made, *any alterations of the leased premises* ... without written consent of the Landlord first had and obtained." Masonic Lease, p. 2, *Emphasis added.*

The 67–page Ground Lease differs radically from the Masonic since its purpose is to permit residential and recreational development on the land. The initial lease term is 75 years; annual rent begins at $50,000 per year. The $50,000 annual "minimum rent" commenced on May 1, 1983 and continued to either May 1, 1988 or "... until one or more of the phases of the property is developed ... in whole or in part, whichever occurs first...." Where phases of construction are completed during the first five years, the rent is substantially increased pursuant to a detailed formula. Thereafter, except as just provided, the annual rent for the first seven years is $362,278 per year, and after that the rent is redetermined each 8 years relative to the fair market value of the property.

Permitted use of the land under the two leases is very different; under Masonic lease the land and buildings, except for repair, are to remain as they were at lease inception; "alterations" to the premises can only be made with prior written approval. For the privilege of maintaining and using the land "as is", Prestige Point paid only $2,200 per year in rent. But under Paragraph 5 of the Ground Lease, "alterations" are not only permitted, but major construction is *required;* if construction is not commenced within the first five years the Ground Lease agreement automatically terminates and each party is relieved of any further obligation to the other. For this use Prestige Point is required to pay rent of between $50,000 and $362,-000 (or more) per year.

As set out more fully below, at the time of executing the Ground Lease, the parties, Prestige Point and Bear Valley, intended that the two leases, despite their vastly different purposes in tact, would run along together.

## DEBTOR'S ACTIONS DURING CASE

On May 21, 1987, and after obtaining an order extending time, Debtor filed a motion

to assume the Ground Lease. Debtor argued maintaining the Ground Lease essential since it is Debtor's primary asset, which, under a plan, would benefit the estate either by developing the land, or sale of the leasehold. In its papers to assume the lease, alluded to a dispute, of sorts, between Prestige Point and Bear Valley as to the true nature of the Ground Lease— whether it is a lease, or a lease/option, or an executory contract. In any case, on June 10, 1987, an order was entered confirming Debtor's assumption of the Ground Lease. Thereafter, no mention was made in the case regarding any dispute as to the characterization and/or legal effect of the Ground Lease agreement.

Following assumption, Debtor defaulted with regard to two key provisions of the Ground Lease: It failed to (1) make the May 1988 rent payment, and (2) commence construction within five years of execution. Debtor admits these failures, in rather vague terms, in its amended disclosure statement, filed in November 1988. *See,* Debtor's Disclosure Statement of August 31, 1988, as Amended November 10, 1988, P. 6, lines 20–24. The Disclosure Statement reads, in part:

> Bear Valley Mutual Water Company has presented its notice claiming the [Ground] lease terminated. However, the debtor has tendered payment under the "Masonic Lease".... The lessor has disputed its continued existence.... Debtor maintains it holds a 23 year lease on the premises. *Id.* P. 7, lines 2–9.

Later in the disclosure statement Debtor states:

> The debtor has been unable to secure financing for the development of the property, which has resulted in the termination of its long-term [Ground Lease] agreement with Bear Valley.... The debtor retains the rights to the property for the next approximately 23 years. *Id.* P. 8, lines 17–22.

[To this Court's knowledge, this was the first mention during the case of Debtor's claim of interest in the Masonic lease].

On December 23, 1988 an order confirming Debtor's plan of reorganization was entered. The confirmed plan makes no provision for assuming the Masonic Lease.

### DECLARATORY JUDGMENT

■ Pursuant to 28 U.S.C. Section 2201 "... [A]ny court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not such further relief is or could be sought." Declaratory relief actions in Bankruptcy Court are adversary proceedings. Bankruptcy Rule 7001(9). Such declaration, when rendered, has the full force and effect of a final judgment or decree. 28 U.S.C. Section 2201. The procedure for obtaining a declaratory judgment is in accordance with *F.R.C.P.* Rule 57, 28 U.S.C. Such judgment may be rendered where, given the facts alleged and all the circumstances, there is found to exist a substantial controversy between parties having adverse legal interests which is real and immediate. *Maryland Causality v. Pacific Oil & Coal,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941).

■ There is an actual controversy between these parties involving Debtor's legal rights and interests under the leases. The construction of landlord and tenant rights is a matter of state law, but the leasehold interest, where it is claimed to be an asset of the bankruptcy estate, must be construed under bankruptcy law. *In re Harris Pine Mills,* 862 F.2d 217 (9th Cir. 1988).

By its complaint lessor Bear Valley sought a declaration of rights and interests under both leases—alleging Debtor had no rights remaining in either. As a general rule of law "... the plaintiff must sustain the burden of proof and thereby 'bear the risk of nonpersuasion of his prima facie case' ". *In re Air Vectors Associates,* 53 B.R. 668, 685 (Bankr.S.D.N.Y.1985) citing 6A *Moore's Federal Practice,* Parag. 57.- 31[1] at 57–283 (1984).

The Joint Pre-trial Order prepared by the parties, and signed by the Court, abandons questions regarding the viability of the Ground Lease, and in fact during the pre-

trial conference, and on the record, the parties agreed that the Ground Lease had been terminated and is no longer an asset of the estate. Therefore, the focus of the litigation is only on the Masonic Lease.

In its complaint Bear Valley contends that Prestige Point has no remaining interest in the Masonic Lease, and therefore it is not an asset of the estate, for the following reasons:

1— Debtor failed to exercise the option to renew the lease and therefore it expired by its own terms, prior to the bankruptcy, on April 30, 1986; and

2— Debtor failed to assume the lease pursuant to Bankruptcy Code § 365(d)(4), it is "deemed rejected", and therefore Debtor has no remaining rights or interest in the property.

Prestige Point contends that:

1— Either it properly exercised the option to renew on or about June 26, 1985, or lessor waived and is estopped from requiring exact performance in the manner prescribed for renewal under Paragraphs 16 and 14; and

2— Assumption of the Ground Lease by order within the bankruptcy case is sufficient to either "subsume", "suspend", "imply" or "excuse" assumption of the Masonic Lease within the bankruptcy case, and therefore the Masonic Lease has survived and remains an asset of the Debtor.

## ANALYSIS

### PROPERTY OF THE ESTATE

Section 541(a)(1) of the Bankruptcy Code, 11 U.S.C. § 541(a)(1), provides that the commencement of a case "creates" an estate, and that such estate includes ". . . all legal and equitable interests of the debtor in property . . ." as of the commencement. A voluntary case, as this one, commences with its filing. 11 U.S.C. § 301. However, § 541(b)(2) excludes as property of the estate any interest of the debtor as a lessee under a lease of nonresidential real property that terminated at the expiration of its term prior to the filing of the case.

*Did the Lease Term Expire Prior to Bankruptcy?*

While the Masonic Lease term was from May 1, 1964 to April 30, 1986, the agreement provided an option to renew for an additional 25 years by "written notice of Tenant's intention to renew . . . to Landlord" at least three months prior to the expiration of the term, i.e. on or before January 30, 1986.

During the course of the relationship with plaintiff, Debtor delivered its lease payments to Ms. Norma Harper (hereinafter "Harper"), a real estate broker, who maintains an office facility in Big Bear, California, the city in which the property is located. In addition to her other business interests, Ms. Harper is an agent of Bear Valley; her real estate office has two prominent exterior signs; one reading Harper and Pontell Real Estate, and the other which reads "Bear Valley Mutual Water Company". While Harper acknowledged that she is an agent for Bear Valley, she neither is nor was an officer or director of Bear Valley Mutual Water Company. Further, Ms. Harper testified, without contradiction, that the scope of her agency does not extend to the making and/or modification of contracts between Bear Valley and third parties. Only the Board, she testified, can authorize and approve contracts and their modifications.

At trial Debtor's witnesses testified that on or about June 25, 1985, while James N. Hunter, President of one of Debtor's coventurers, was hospitalized and facing serious heart surgery, he dictated to his wife a letter to be delivered to Bear Valley. Mrs. Rosa Hunter testified that she had been advised by Ms. Harper that because of Hunter's illness and the fact that the lease option period was coming up soon, the option should be exercised; "She [Harper] told us we should protect ourselves;" "She said 'Have Jim write a letter to *Bear Valley* to exercise the lease on the Masonic lease'". Mrs. Hunter, and others, stated that they and Mr. Hunter were in fear that he might not survive the surgery and were therefore motivated to act to ensure the option was not lost. The alleged letter, a

copy of which was introduced into evidence, affirmatively expressed Debtor's intention to renew the lease. Upon preparation the letter was given to their teenage daughter (hereinafter "Ms. Hunter") who stated that she personally delivered it to Ms. Harper's Big Bear office.

Ms. Hunter further testified that when she entered the Harper & Pontell real estate office in search of Ms. Harper, she did not see Ms. Harper but saw Ms. Harper's partner in an adjacent room on the telephone. Rather than wait to see him, she simply gestured to him that she had something, and he gestured by pointing at a desk near the door. She then "dropped" the letter on the desk she believed to be that of Harper. She said that she did not mail the letter to Bear Valley or Ms. Harper because Harper's office was only a block from the post office. But what neither Ms. Hunter nor any other of Debtor's witnesses explained to the Court was: (1) Since the letter was given to her by her mother in Riverside, California, some 50 miles from Big Bear, why the letter simply wasn't mailed from Riverside to Bear Valley's home office; and/or (2) Whether the letter, while being described as being in an envelope, was addressed to Bear Valley or in anyway notated or highlighted to bring to anyone's attention that it was important and intended to be delivered to Bear Valley.

The California Supreme Court in *Palo Alto Town & Country Village, Inc. v. BBTC Company*, 11 Cal.3d 494, 113 Cal. Rptr. 705, 521 P.2d 1097 (1974) makes clear that under state law the manner or mode for acceptance, or exercise, of an option contract falls within the provisions for accepting a "proposal" under *California Civil Code* § 1582. That Section states that:

> If a proposal prescribes any conditions concerning the communication of its acceptance, the proposer is not bound unless they are conformed to; but in other cases a reasonable and usual mode may be adopted.

'Conditions' under *Civil Code* § 1582 is not to be construed as a covenant, but as a condition precedent. *Simons v. Young*, 93

Cal.App.3d 170, 179, 155 Cal.Rptr. 460 (1979).

"It is well settled that when provisions of an option contract prescribe the particular manner in which the option is to be exercised, they must be strictly followed." *Palo Alto Town & Country Village, supra*, 11 Cal.3d at 498, 113 Cal.Rptr. 705, 521 P.2d 1097, citing *Flickinger v. Heck*, 187 Cal. 111, 114, 200 P. 1045 (1921), and *Callisch v. Farnham*, 83 Cal.App.2d 427, 430, 188 P.2d 775 (1948); see also *Simons v. Young, supra*, 93 Cal.App.3d 179, 155 Cal.Rptr. 460 [the option to renew is an irrevocable offer that can be converted into an enforceable contract only by acceptance on the terms specified in the offer.]

In applying Section 1582 and California case law to our facts the first question then is: Did the lease provide conditions concerning the communication of acceptance of the option to renew? No specific requirements are set forth in the same paragraph providing the option, but Paragraph Fourteen, entitled "Notices" states:

> "*Among other methods of service*, any notice relating to this lease or rights or remedies hereunder may be served ... upon the Landlord by Tenant by mailing such notice by certified United States mail, postage prepaid, *addressed to Landlord at 101 E. Olive Street, Redlands, California.*" *Emphasis added.*

Since Paragraph Fourteen leaves the precise "method" undefined the Court must look to determine whether the method employed by Prestige Point can be construed as a "reasonable and usual mode". The uncontroverted evidence was that Prestige Point had always, without protest or rejection, paid its rent by delivery to Ms. Harper as agent for Bear Valley. That appears to be, therefore, the reasonable and usual method for paying rent; yet rent is not "notice", and more particularly not notice to exercise an option to renew a lease for a term of years—an important event which in this case occurs only once every 20 years, or so. There was no testimony as to any other "notices" required under the agreement being delivered to the office of Ms. Harper as agent for Bear Valley.

This Court finds personal delivery of any "notice", as opposed to delivery by mail, reasonable within the provision of the Notice language of—"Among other methods". Yet, the Court holds delivery of the renewal notice to any place other than the specific address listed in Paragraph Fourteen, i.e. addressed to Bear Valley etc., at 101 East Olive Street, Redlands, California,—fails the requirement of "strict compliance" and therefore renders the attempted exercise ineffective, null and void.

■ Moreover, even if the Court were in error on this point, Debtor's attempted exercise would fail on other grounds. First, the Court does not believe that the "dropping" of a letter at an unoccupied desk, where there is no evidence that it was addressed to Bear Valley or in any way presented in a manner designed to draw attention to itself, is reasonable. There was no testimony as to why Prestige didn't contact Bear Valley to make arrangements for such an important delivery, or why the young Ms. Hunter did not attempt to deliver such an important document personally to Ms. Harper or wait to hand it personally to Ms. Harper's partner, explain its importance, and wait for an acknowledgement. The casualness of the purported delivery undermines the credibility of the Hunter family testimony regarding the gravity of their concern and actions.

Secondly, having carefully observed and listened to the testimony of Prestige Point's witnesses on the issue of the preparation and delivery of the "letter", the Court simply found them not credible and unpersuasive. While acknowledging that a serious surgery may tend to prompt persons to get their "effects" in order, there was no explanation why, with 6 months remaining to exercise the option, it was while Hunter was in the hospital awaiting imminent surgery, that they decided to take care of this particular bit of business. Hunter had numerous business ventures under his supervision, but no testimony was given as to any other matters that were taken care of "just in case". Additionally, Hunter's coventurer could have exercised the option, and further, other officers of the Hunter corporation might have been authorized to exercise the option. Even if Hunter had not survived, the corporation would continue its existence, and the option to renew the Masonic lease would have remained available to the corporation.

Finally, Ms. Harper testified unequivocally, and to the satisfaction of the Court, that she never received the letter. Ms. Harper's partner was not called to corroborate the daughter's story about dropping the letter on the desk upon his gesture to do so.

*Is Bear Valley Estopped to Deny the Exercise of the Option? or Has Bear Valley Waived its Right to Demand the Option's Exercise?*

■ Both James Hunter and his wife testified that approximately a month or so after the alleged option renewal letter was delivered, Ms. Harper, following their inquiry, acknowledged receiving the option letter and stating that everything was "okay". Mrs. Hunter said she asked "Was the letter on the Masonic lease okay?"; Ms. Harper, she said, responded, "Fine". Mrs. Hunter stated that five other persons were present at the conversation, but no other witness testified with any greater specificity as to the content of the conversation. Additionally, Mrs. Hunter stated, "[A]t another time" (not specified), she had dinner with Ms. Harper where "... we were talking about it". Again there were no details of any kind as to the substance of the alleged conversation. Ms. Harper denied any such conversations took place.

Robert MacDonald testified that on the first or second day of June, 1987 he showed Ms. Harper a $55,000 cashier's check payable to Prestige Point's bankruptcy attorney, Barrington A.S. Daltrey (which McDonald was advancing to Debtor to make its Ground Lease payment), and at that time ask her what would happen under the leases if construction didn't begin within the 5 year period. Ms. Harper acknowledged such conversation with MacDonald and confirmed that she told him she believed that the Masonic lease would still be in effect, and that if the Ground Lease

terminated because construction was not started, Prestige Point could "fall back" on the Masonic lease. She testified that this was her belief because the Ground Lease, which she helped draft, had a "5 year clause" in it to permit commencement of construction.

The equitable defenses of estoppel and waiver are generally disfavored in actions at law. The doctrine of estoppel acts defensively only, and applies only "[When] a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." *California Evidence Code* § 623. To prevail on such defense the proponent must prove all elements showing that plaintiff: (1) Made a representation or concealment of material facts, (2) With knowledge, actual or virtual, of the facts, (3) To a party ignorant, actually or permissibly, of the truth, (4) With the intent, actual or virtual, that the latter act upon it, and (5) The party was induced to act upon it to his detriment. *Wood v. Blaney,* 107 Cal. 291, 40 P. 428 (1895), *Long Beach v. Mansell,* 3 Cal.3d 462, 91 Cal.Rptr. 23, 476 P.2d 423 (1970).

Again, having observed the witnesses, hearing their testimony, examining the documents, reviewing the bankruptcy petition, schedules, statements and all documents relating to the leases in these proceedings, the Court simply does not find the Hunters' testimony on the issue credible or persuasive; Ms. Harper was simply more believable. That being the case, Prestige Point has failed in the first instance to show Ms. Harper made any representation to them on the subject, let alone a representation with the intent to induce them to rely to their detriment.

Inasmuch as MacDonald's conversation with Ms. Harper occurred a full year after the Masonic lease expired by its terms, the Court finds that nothing Ms. Harper said to him at that time could be said to have either misled or induced Prestige Point regarding the proper exercise of the option. And whether Ms. Harper's opinion misled

Mr. MacDonald to invest his money in the Prestige Point venture is not a matter before the Court. In short, the Court finds no basis upon which to invoke the defenses of either waiver or estoppel.

Finally, Debtor's assertion that the efforts of a third party and assignor to Prestige Point of the Masonic lease, Billy Bownds, to make inquiries regarding the exercise of the option should work as estoppel in favor of the Debtor, is without merit. Bownds had no authority or standing to exercise the option either on Debtor's behalf or his own. Additionally, his letters to Bear Valley, which were introduced in evidence were in fact nothing more than inquiries and could not be construed as evidence of Debtor's intent to renew.

For all the foregoing reasons, the Court finds the option was not exercised, either directly or indirectly, nor is there evidence to find Bear Valley waived the requirement of timely and proper renewal, nor that Bear Valley is estopped to deny proper and timely exercise of the option to renew the Masonic lease. Therefore, the Masonic lease neither is nor ever was property of Debtor's estate since the lease agreement terminated by its own terms on April 30, 1986 and prior to the commencement of the case. 11 U.S.C. § 541(b)(2).

While the foregoing should end the matter, in the event the Court is found to be in error, the Court further finds that the Masonic lease is not now, nor has it been since 60 days after the filing of Debtor's petition, property of the estate.

## DID DEBTOR ASSUME THE MASONIC LEASE DURING THE PROCEEDING?

■ With respect to the assumption or rejection of a lease of nonresidential real property, Bankruptcy Code § 365(d)(4) provides, in part, that:

... in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within the 60-day period fixes, then such lease

is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

It is uncontested that Debtor assumed the Ground Lease by order of the Court entered June 10, 1987. Prestige Point asserts that by assuming the Ground Lease the Masonic was also assumed. In support of this claim Prestige relies on Paragraph 32 of the Ground Lease which reads:

> 32. This lease does not supercede and terminate the leases of property executed by and between Landlord and any predecessor in interest of Tenant, including but not limited to, that certain lease dated March 31, 1964, by and between Landlord and ... Masonic Homes of California, as Tenant, until work is commenced on the first phase of the construction, at which time said leases shall be of no further force and effect. Pending the commencement of such construction, and while rent is being paid under this Lease, no rent shall be due under the above lease, or leases.

In reliance on this paragraph Prestige Point argues that upon execution of the Ground Lease the Masonic lease was no longer in effect; Debtor's Masonic rights as lessee, they assert, "ceased" when the Ground Lease became operative rendering the Masonic agreement no longer a lease but a set of "contingent contractual right(s)" which would be revived as a lease only when the Ground Lease terminated. Or, stated differently,—the Masonic lease remained in "suspense", i.e. contingent rights which could be "reattained". For those reasons Debtor asserts that the Masonic agreement was not, until the termination of the Ground Lease, a lease, and therefore, not being a lease, no assumption pursuant to § 365(d)(4) was possible or required. Debtor citing no authority for such argument, concedes it is "abstract".

The Ninth Circuit made clear in *In re Moreggia & Sons, Inc.*, 852 F.2d 1179, 1182 (9th Cir.1988) that "... [N]ot every interest that might qualify as a lease under state law is subject to the automatic rejection provision of section 365. Our analysis ... convinces us that the appropriate focus is on the federal law purposes of Section 365(d)(4) and the economic realities of this particular arrangement." This court is instructed by *Moreggia* to look at the economic substance of the transaction to determine whether a true lease exists for the purposes of the Code. *Id.*, p. 1183.

Having examined the two "leases", this Court concludes that the Masonic agreement is a true lease, granting, as it does, an exclusive possession against the world, including the owner [*Von Goerlitz v. Turner*, 65 Cal.App.2d 425, 150 P.2d 278 (1944)], in an estate for a definite term of years [*Black v. Black*, 77 Cal.App. 82, 246 P. 90 (1926)], and contains other features commonly associated with a true lease. While the Ground "lease" appears to share these features, it has other features which persuade this Court that it may not be a true lease; perhaps it is an "option" to hold the land "for development" pending receipt of funding; perhaps it's a joint venture between Prestige Point and Bear Valley. But in any case it does not appear to this Court to be a "true lease"; "[T]he parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *Moreggia, supra*, p. 1184, citing *In re PCH Associates*, 804 F.2d 193, 200 (2nd Cir.1986). But even if the Court is wrong as to the characterization of the Ground Lease, its character is not really at issue—whether the Masonic lease is presently property of the estate is the issue.

Also under *Moreggia* this Court is required, when the question is raised whether a "lease" is subject to the requirements of § 365(d)(4), to examine the federal law purposes of that section. Among those purposes is to protect lessors from uncertainty and delay, and protect the estate from unexpected liability unless the trustee or debtor in possession *acts affirmatively* to bring the lease into the estate. *In re Sea Harvest Corp.* 868 F.2d 1077 (9th Cir.1989). To assume an unexpired lease the Trustee or debtor in possession is required to set the matter for hearing on noticed motion extending an opportunity to the landlord, among others, to be heard. The motion

**652**

must state with "particularity" the trustee's ground for wishing to assume the obligation. Bankruptcy Rules 6006(a), 9014 and 9013. "Strict compliance with these requirements avoids *ad hoc* inquiries into the meaning of debtor's words and actions. Anything short of this standard risks uncertainty, which is exactly what Section 365(d)(4) was designed to remedy". *Sea Harvest, supra,* p. 1079. [In *Sea Harvest* landlord and debtor/tenant, without noticed hearing, entered into a stipulation to assume a lease. The trial court found the lease "deemed rejected"; the 9th Circuit affirmed].

As earlier stated, Debtor *neither* filed and set for noticed hearing a motion to extend time to assume the Masonic lease, *nor* did it ever file and set for hearing a motion to assume the Masonic lease, *nor* did Debtor in its motion to assume the Ground Lease describe with the required "particularity"—let alone even mention—Debtor's theory or claim that assumption of the Ground Lease "subsumed" or incorporated assumption of the Masonic lease.

Whether upon bringing a timely and proper motion by Debtor to assume the Masonic lease this Court would have found "lessor uncertainty and delay", or an "unexpected liability on the estate", is beside the point. The point is that the Code required such motion within the 60–day period precisely to avoid the kind of "abstract" arguments regarding "subsumed contingent contractual rights" which are in "suspense" and then "resurrected and regained". Neither creditors, nor the U.S. Trustee, nor the Landlord, nor the Court, is required to be a "mind-reader" of Debtor's assumptions regarding assumption. Had Debtor complied with Section 365, as this Court holds is required, this trial for declaratory judgment would not have been required.

### CONCLUSION

For all the foregoing reasons, the Court declares the Debtor has no rights in the Masonic lease, and pursuant to Section 365(d)(4) Debtor shall immediately surrender the property to lessor, Bear Valley.

This opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.